|  |  |
|---|---|
| JAMES CHRISTIAN, Individually and on behalf of all others similarly situated, | Civ. No. 2:17-cv-00497-KM-JBC |
| Plaintiff, | **OPINION** |
| v. | |
| BT GROUP PLC, GAVIN PETERSON, IAN LIVINGSTON, and TONY CHANMUGAM, | |
| Defendants. | |

**MCNULTY, District Judge**

Before the Court in this putative federal securities class action are competing motions of

(1) a group of individual plaintiffs consisting of Gary Classen, Alice Korenblat, Robert Korenblat, and Pierre-S. Lefebvre (collectively, the "Classen Plaintiffs") (ECF No. 11); and

(2) plaintiff PAMCAH-UA Local 675 Pension Fund (the "Pension Fund") (ECF No. 10).

Each seeks appointment as lead plaintiff and appointment of its counsel as lead counsel.[1]

## I.    BACKGROUND

The underlying securities class action is brought on behalf of purchasers of the securities of defendant BT Group PLC ("BT Group") between May 24, 2012 and January 23, 2017 (the "Class Period"). The plaintiffs allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), as amended by the Private Securities Litigation Reform Act of

---

[1]    Plaintiff James Christian also filed a motion to be appointed lead plaintiff (ECF No. 9). Recognizing that he does not appear to have the largest financial interest in this litigation, he has since withdrawn that motion (*see* ECF No. 19).

1995 (the "PSLRA"), 15 U.S.C. § 78u-4, *et seq.*, and of the Securities and Exchange Commission (the "SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. §§ 240.10b-5.

BT Group is a communications services company whose securities are publicly traded on the New York Stock Exchange ("NYSE"). Named plaintiff James Christian, on behalf of a putative class, alleges that from 2012 through 2016 BT Group issued annual reports that summarized balance sheets of company operations. Those annual reports stated that the company maintained adequate internal controls over its financial reporting. Those reports also contained Sarbanes-Oxley Act ("SOX") certifications "attesting to the accuracy of the financial statements, the disclosure of any material changes to the Company's internal controls over financial reporting and the disclosure of all fraud." (Compl. ¶¶ 16–30)

The plaintiffs allege that statements made in BT Group's 2012–16 annual reports were materially false or misleading because they failed to disclose adverse facts known to or recklessly disregarded by BT Group and its officers at the time. More specifically, the plaintiffs allege that BT Group's 2012–16 annual reports misstated earnings, failed to disclose improper accounting practices, sales, and transactions in BT Group's Italian operations, and failed to disclose that BT Group's internal controls were ineffective. (Compl. ¶ 31). The plaintiffs say these truths first emerged through two press releases published in late 2016.

A. *BT Group's First Corrective Disclosure*

First, the plaintiffs cite an October 27, 2016 press release which announced BT Group's results for the second quarter and half year to September 30, 2016. That press release revealed a write-down of the value of items on its balance sheet by £145 million. The press release stated, in part:

> **Specific items**
> Specific items resulted in a net charge after tax of
> £151m (Q2 2015/16: £52m
> charge). See Note 4 for a breakdown.
>
> **BT Italia investigation**

2

> *Following allegations of inappropriate management behaviour in our BT Italia operations, we have conducted an initial internal investigation. This included a review of accounting practices during which we have identified certain historical accounting errors and reassessed certain areas of management judgement.*
>
> *We have written down the value of items on the balance sheet by £145m.* This is our current best estimate of the financial impact based on our internal investigation. The write down relates to balances that have built up over a number of years and our assessment is that the errors have not materially impacted the group's reported earnings over the previous two years. The amount has been charged as a specific item in our results for the quarter. As a non-cash item in the period it does not impact normalised free cash flow.
>
> A full investigation of these matters is ongoing and we have appointed external advisers to assist with this. Appropriate action will be taken as the investigation progresses.
>
> Our outlook is not affected.

(Compl. ¶ 32 (emphasis in Complaint)).

Following this press release, shares of BT Group fell $0.57 per share, representing a 2.39% drop from its previous closing price of $23.25 on October 27, 2016. (*Id.* ¶ 33; IM Opp. 5)

B. *BT Group's Second Corrective Disclosure*

Second, on January 24, 2017, BT Group issued a press release announcing an update on its investigation into its Italian operations. This press release stated, in part:

> **Update on investigation into BT's Italian business and on BT Group outlook**
>
> **Update on investigation into BT's Italian business**

BT previously announced on 27 October 2016 that an initial internal investigation of accounting practices in its Italian business had identified certain historical accounting errors and areas of management judgement requiring reassessment. At that time, we announced the write down of items on the balance sheet by £145m, being the then best estimate of the financial impact of these issues.

Since then we have progressed the investigation, which has included an independent review by KPMG LLP of the accounting practices in our Italian operations and our own comprehensive balance sheet review. *These investigations have revealed that the extent and complexity of inappropriate behaviour in the Italian business were far greater than previously identified and have revealed improper accounting practices and a complex set of improper sales, purchase, factoring and leasing transactions. These activities have resulted in the overstatement of earnings in our Italian business over a number of years.*

*The investigation into the financial position of our Italian business is now substantially complete. The adjustments identified have increased from the £145m announced in our half-year update to a total of around £530m.* We are still evaluating what proportion of the total adjustments should be treated as prior year errors, and what proportion should be treated as the reassessment in the current year of management estimates. Work is also ongoing to establish how these adjustments should be reflected in BT Group's financial statements for the current and previous periods in light of applicable accounting requirements.

In addition, we would expect the matters described above to result in a reduction in our Q3 adjusted revenue and adjusted EBITDA of around £120m, and in a reduction in Q3 normalised free cash flow of around £100m. For 2016/17 as a whole, relative to our prior outlook, we would expect a decrease in adjusted revenue of around £200m, in adjusted EBITDA of around £175m, and of up to £500m of normalised free cash flow due to the EBITDA impact

and the one-off unwind of the effects of inappropriate working capital transactions. For 2017/18, we would expect a similar annual impact to adjusted revenue and adjusted EBITDA as in 2016/17, with the EBITDA impact flowing through to normalized free cash flow. An updated outlook for the Group reflecting the above and other matters is set out below.

The EBITDA contribution of the Italian business included in the Group's reported EBITDA for the financial year ended 31 March 2016 was around 1%.

The improper behaviour in our Italian business is an extremely serious matter, and we have taken immediate steps to strengthen the financial processes and controls in that business. We suspended a number of BT Italy's senior management team who have now left the business. We have also appointed a new Chief Executive of BT Italy who will take charge on 1 February 2017. He will review the Italian management team and will work with BT Group Ethics and Compliance to improve the governance, compliance and financial safeguards in our Italian business.

Further, we are conducting a broader review of financial processes, systems and controls across the Group. The BT Group Remuneration Committee will consider the wider implications of the BT Italy investigation.

Additionally, on January 24, 2017, Gavin Patterson, Chief Executive BT Group, stated:

We are deeply disappointed with the improper practices which we have found in our Italian business. We have undertaken extensive investigations into that business and are committed to ensuring the highest standards across the whole of BT for the benefit of our customers, shareholders, employees and all other stakeholders.

(Compl. ¶ 34)

Following this second press release, BT Group's stock price fell by $5.05 per share, or over 20%, from its previous closing price of $19.38 per share on January 24, 2017. (*Id.* ¶ 35)

The plaintiffs claim that they and other class members have suffered losses as the result of BT Group's fraudulent acts and omissions and the decline in the market value of BT Group's shares that resulted. (*Id.* ¶ 36)

## II.    LEGAL STANDARD

The PSLRA governs the appointment of the lead plaintiff in "each private action arising under the [Exchange Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(1). The PSLRA directs courts to adopt a rebuttable presumption that "the most adequate plaintiff is the person or group of persons that has (1) either filed the complaint or made a motion in response to the notice to the class; (2) has the largest financial interest in the relief sought by the class; and (3) otherwise satisfies the requirements of Federal Rule of Civil Procedure 23." *Lewis v. Lipocine Inc.*, No. CV 16-4009-BRM-LHG, 2016 WL 7042075, at *4 (D.N.J. Dec. 2, 2016) (citing *Fields v. Biomatrix, Inc.*, 198 F.R.D. 451, 456 (D.N.J. 2000) and 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)).

Rule 23 requires that the party or parties seeking to represent a class (1) "have claims or defenses that are typical of the claims or defenses of the class," (the "typicality requirement") and (2) "be able to fairly and adequately protect the interests of the class," (the "adequacy requirement"). Fed. R. Civ. P. 23(a); *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 263 (3d Cir. 2001); *Lewis*, 2016 WL 7042075, at *4.

"Once a presumptive lead plaintiff is located, the court should then turn to the question [of] whether the presumption has been rebutted." *In re Cendant*, 264 F.3d at 268. The presumption "may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—(aa) will not fairly and adequately protect the interests of the class; or

(bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II); *see also In re Cendant*, 264 F.3d at 268 ("[T]he question is not whether another movant might do a better job of protecting the interests of the class than the presumptive lead plaintiff; instead, the question is whether anyone can prove that the presumptive lead plaintiff will not do a 'fair[ ] and adequate[]' job." (citation omitted)).

Thus, one way a movant may rebut the presumption is with "proof that the presumptive lead plaintiff is 'subject to unique defenses that render such plaintiff incapable of adequately representing the class.'" *Grodko v. Cent. European Distribution Corp.*, No. CIV.A. 12-5530 JBS, 2012 WL 6595931, at *3 (D.N.J. Dec. 17, 2012) (quoting 15 U.S.C. § 78u-4 (a)(3)(B)(iii)(II)(bb)). As the United States Court of Appeals for the Third Circuit has recognized, "the challenge presented by a defense unique to a class representative [is that] the representative's interests might not be aligned with those of the class, and the representative might devote time and effort to the defense at the expense of issues that are common and controlling for the class." *Beck v. Maximus, Inc.*, 457 F.3d 291, 297 (3d Cir.2006). "A proposed class representative is neither typical nor adequate if the representative is subject to a unique defense that is likely to become a major focus of the litigation." *Id.* at 301; *see also Grodko*, 2012 WL 6595931, at *3.

Judge Arleo of this District has usefully explained that the proof required to rebut the presumption at this early stage of litigation "need not definitively establish" the allegedly unique defense; "Rather, the competing plaintiff must show simply that there is some degree of probability that the defense might 'become a major focus' in the case." *In re Enzymotec Ltd. Sec. Litig.*, No. CIV.A. 14-5556, 2015 WL 918535, at *2 (D.N.J. Mar. 3, 2015) (quoting *Steamfitters Local 449 Pension Fund v. Cent. European Dist. Corp.*, Nos. 11–6247, 11–7085, 2012 WL 3638629, at *9 (D.N.J. Aug.22, 2012)); *cf. Roofers' Pension Fund v. Papa*, No. CV 16-2805, 2017 WL 1536222, at *4 (D.N.J. Apr. 27, 2017)

(explaining that movants seeking to rebut the presumption "do[] not have to prove the defense, but [t]he[y] must provide enough evidence to show that it is not speculative or meritless").

## III. DISCUSSION

The moving parties do not dispute that the Pension Fund is the presumptive lead plaintiff because it has suffered the largest losses—approximately $78,515—and otherwise satisfies Rule 23 requirements. At issue is whether the Classen Plaintiffs have submitted sufficient "proof" that the Pension Fund is subject to a unique defense likely to become a major focus of the case as it proceeds. The Classen Plaintiffs say they, not the Pension Fund, should be appointed lead plaintiff because the Pension Fund sold all of its BT Group shares before the second of the two corrective disclosures alleged in the complaint (i.e., after October 27, 2016, but before January 24, 2017), making it uniquely susceptible to a loss causation defense. (IM Opp. 5)

*A. Loss Causation*

Some background on loss causation in this context is necessary. To state a claim for securities fraud under § 10(b), a plaintiff must plead: (1) a material misrepresentation in connection with the purchase or sale of a security; (2) scienter, *i.e.*, a wrongful state of mind in the party making the representation; (3) reliance by the plaintiff; (4) economic loss; and (5) "loss causation, *i.e.*, a causal connection between the material misrepresentation and the loss." *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 493–94 (3d Cir. 2016) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42, 125 S.Ct. 1627 (2005)). The PSLRA also prescribes that "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4.

In *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347, 125 S. Ct. 1627, 1634 (2005), the U.S. Supreme Court held that a plaintiff had not adequately pleaded loss causation for purposes of a 10b-5 claim where the complaint did

not "claim that [the defendant's] share price fell significantly after the truth became known", suggesting "the plaintiffs considered the allegation of purchase price inflation alone sufficient." *Id.* at 347. The Third Circuit has since explained:

> In a typical "fraud-on-the-market" § 10(b) action, the plaintiff shareholder alleges that a fraudulent misrepresentation or omission has artificially inflated the price of a publicly-traded security, with the plaintiff investing in reliance on the misrepresentation or omission; to satisfy the loss causation requirement, the plaintiff must show that the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff.
>
> . . . .
>
> [T]he plaintiff must show that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss.

*McCabe v. Ernst & Young, LLP.*, 494 F.3d 418, 425–26 (3d Cir. 2007) (citations omitted).

### B. The Classen Plaintiffs' Arguments

The Classen Plaintiffs argue that BT Group is likely to argue that the Pension Fund cannot establish loss causation under *Dura* and its progeny. The Pension Fund sold all of its shares after the first, October 2016 press release. That first press release allegedly precipitated only a 2.39% drop in share price. In contrast, the Classen Plaintiffs held their shares until after the second, January 2017 press release. The drop in share price following that second press release was far greater—in excess of 20%. (IM Opp. 6) The Classen Plaintiffs also compare the relatively lower trading volume at the time of the 2.39% drop (811,000 shares) with the trading volume at the time of the 20% drop (7.8 million shares); this, they say, "possibly indicat[es] that the market was not reacting to the revelation of a fraud on that day [*i.e.,* October 27, 2016]." (IM Opp. 5–6)

Additionally, the Classen Plaintiffs submit that BT Group will argue that other factors—not the first, partial disclosure—caused the 2.39% drop in October 2016. For example, they say, the October 2016 corrective disclosure "coincided with [BT Group's] disclosure of a 10% decline in earnings per share, a challenging UK market, and the negative impact on the Company from weakening British currency." (IM Opp. 6 (citing *In re Merrill Lynch & Co. Research Reports Sec. Litig.,* 568 F. Supp. 2d 349, 365 (S.D.N.Y. 2008) (holding that plaintiffs did not allege loss causation where they failed to allege facts supporting an inference that the alleged fraud, rather than other market factors or the materialization of disclosed risks, caused the defendant's financial losses)).

The Classen Plaintiffs continue that, to the extent the October 2016 disclosure was not a loss causation event, the Pension Fund is an "in-and-out" trader—*i.e.,* an investor that bought "into and out of the securities at issue *during* the class period," *IBEW Local 90 Pension Fund v. Deutsche Bank AG,* No. 11 CIV. 4209 KBF, 2013 WL 5815472, at *19 (S.D.N.Y. Oct. 29, 2013). To that extent, they were not damaged by the alleged fraud and thus are not typical of other class members. (IM Opp. 6) Indeed, they argue, the Pension Fund might lack standing altogether if BT Group shows the Pension Fund was not damaged by the alleged fraud.

C. *The Pension Fund's Argument*

The Pension Fund replies that the Classen Plaintiffs do not and cannot deny that the Pension Fund suffered its losses as the result of the October 2016 disclosure; this is not like the cases the Classen Plaintiffs cite where an earlier, partial disclosure did not actually reveal the alleged fraud at all. *See, e.g., In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 41 (2d Cir. 2009) ("Plaintiffs have failed to demonstrate that any of the information that 'leaked' into the market prior to [the date of the alleged corrective disclosure], revealed the truth with respect to the specific misrepresentations alleged. . . . [R]ather than providing evidence of corrective disclosures, the industry events cited by

10

Plaintiffs appear in their complaint in the context of Defendants' misleading statements themselves."); *Bensley v. FalconStor Software, Inc.*, 277 F.R.D. 231, 240 (E.D.N.Y. 2011) (presumptive lead plaintiff held inadequate where it was an in-and-out trader and had not alleged sufficient facts from which the court could "confidently infer" that an early disclosure after which it sold its shares "actually revealed fraud or misconduct sufficient to qualify as a partial disclosure"; the early disclosure only announced that financial results would be lower than prior guidance, whereas a later disclosure clearly revealed that improper payments had been made to a customer—i.e., the alleged fraud).

To the contrary, says the Pension Fund, the October 2016 press release revealed the truth that had been hidden—the "inappropriate management behavior" and "historical accounting errors"—and the January 2017 press release was simply an "[u]pdate on the investigation." (PF Reply 7–8) Under facts like these, the Pension Fund argues, "courts routinely appoint investors as lead plaintiffs when they sell their shares of stock after a partial disclosure and are not holding any shares at the time of the later disclosure." (PF Reply 6)

In that respect, the Pension Fund refers primarily to two cases from the Southern District of New York, a veritable hotbed of PSLRA cases. In *Weiss v. Friedman, Billings, Ramsey Grp., Inc.*, the court held that the presumptive lead plaintiff was "not unable to prove loss causation simply because all of its shares were sold before the end of the Class Period," noting that the "case involve[ed] partial disclosures." No. 05-CV-04617(RJH), 2006 WL 197036, at *5 (S.D.N.Y. Jan. 25, 2006). Similarly, in *Montoya v. Mamma.com Inc.*, the court explained that the presumptive lead plaintiff was adequately qualified, despite being an in-and-out trader that sold after a partial disclosure. Loss causation, said *Montoya,* "does not require *full* disclosure and can be established by *partial* disclosure during the class period which causes the price of shares to decline." No. 05 CIV. 2313 (HB), 2005 WL 1278097, at *2 (S.D.N.Y. May 31, 2005). In both cases, the courts also noted that the lead plaintiffs' in-and-out status did not render them unique or wholly atypical, because several other

plaintiffs were also in-and-out traders. *Weiss*, 2006 WL 197036, at *5; *Montoya*, 2005 WL 1278097, at *2. The implication was that any lead class representative would have to represent those plaintiffs' interests as well.

*Weiss* and *Montoya* do not indicate whether the earlier partial disclosures precipitated significantly smaller losses compared to later disclosures, as is the case here. Additionally, neither the complaint nor the parties' briefing in this case indicate whether any other plaintiffs are in-and-out traders, such that a loss causation defense asserted against the Pension Fund would not be particularly unique. Nevertheless, I find the principles underlying *Weiss* and *Montoya* persuasive. *See also Juliar v. Sunopta Inc.*, No. 08 CIV. 1070 (PAC), 2009 WL 1955237, at *2 (S.D.N.Y. Jan. 30, 2009) (explaining, with reference to *Weiss* and *Montoya*, that "[c]ourts in this District have found that where a putative lead plaintiff sold all its shares after a partial disclosure of misconduct by the defendant but before the final disclosure that led to the lawsuit, that putative lead plaintiff does not face the unique defense of having to show loss causation to the extent that it cannot serve as lead plaintiff").

As a court in the Southern District of New York has explained even more recently,

> when calculating movants' financial interests on a lead
> plaintiff motion, courts should not include losses
> resulting from 'in-and-out' transactions, which took
> place during the class period, but before the
> misconduct identified in the complaint was ever
> revealed to the public." *Id.* (internal alterations and
> quotation marks omitted). However, a plaintiff's theory
> of "loss causation may be premised on partial
> revelations that do not uncover the complete extent of
> the falsity of specific prior statements" where the
> partial disclosure "somehow reveals to the market that
> a defendant's prior statements were not entirely true."
> *In re Take–Two Interactive Sec. Litig.*, 551 F.Supp.2d
> 247, 283 (S.D.N.Y.2008).
>
> . . .
>
> [A]s various courts have found, "the announcement of
> ... investigations may qualify as partial disclosures for

12

> purposes of loss causation." *In re Gentiva Sec. Litig.,*
> 932 F.Supp.3d 352, 388 (E.D.N.Y.2013); *see also*
> *TakeTwo,* 551 F.Supp.2d at 288 (collecting cases
> finding the same).

*Kux–Kardos v. VimpelCom, Ltd.*, 151 F. Supp. 3d 471, 476–77 (S.D.N.Y. 2016), *reconsideration denied sub nom. In re VimpelCom, Ltd.*, No. 1-15-CV-8672 (ALC), 2016 WL 5390902 (S.D.N.Y. Sept. 26, 2016); *see also In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 388 (E.D.N.Y. 2013) (addressing announcement of investigation followed by 11% decline in stock price and holding that "an announcement regarding a governmental investigation into the precise subject matter which forms the basis of the fraudulent practices at issue can qualify as a partial corrective disclosure for purposes of loss causation").[2]

I also find that the cases on which the Classen Plaintiffs rely—like other cases in which courts have disqualified presumptive lead plaintiffs on loss causation grounds—are fundamentally distinguishable from the facts of the case before me. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.* and *Bensley, supra*; *see also Grodko v. Cent. European Distribution Corp.*, No. CIV.A. 12-5530 JBS, 2012 WL 6595931, at *5–6 (D.N.J. Dec. 17, 2012) (disqualifying putative lead plaintiffs who sold their shares nine months before the earliest disclosure at issue, rejecting losses following an earlier partial disclosure as sufficient grounds for loss causation where a related complaint described those losses as having an unrelated cause).

In determining what is a partial disclosure for loss causation purposes, the case law instructs courts to hew closely to the allegations of the complaint. *See Grodko*, 2012 WL 6595931, at *6 (determining that the losses and related disclosure the presumptive plaintiff urged as the basis for loss causation stem

---

[2]     The Classen Plaintiffs may intend to argue that the 2.39% price drop following the October 2016 disclosure in this case is not enough of a decline to support loss causation. I disagree with that narrow contention. Judge Simandle has previously interpreted *Dura* as requiring only allegations of a drop in share price in response to corrective disclosures—that is, "a *significant* drop in the price is not required." *Steiner v. MedQuist Inc.*, No. CIV. 04-5487 (JBS), 2006 WL 2827740, at *19 & n.22 (D.N.J. Sept. 29, 2006) (emphasis added). At any rate, $2.39 per share would seem to surmount the threshold of significance, if that were the test.

from misconduct "at the heart of" another action rather than the present action); *In re Smart Techs., Inc. S'holder Litig.*, 295 F.R.D. 50, 59–60 (S.D.N.Y. 2013) (excluding from the class all in-and-out plaintiffs that sold prior to the first disclosure alleged in the complaint, where the complaint "specifically allege[ed] that the purported 'truth' became known for the first time on November 9, 2010," and noting that plaintiffs' argument that the truth leaked *prior* to November 9, 2010 "belies plaintiff's theory of this case as articulated in the [complaint]").

Here, the complaint alleges that the truth began to emerge with the first, October 26, 2016, press release, after which share prices fell to the detriment of investors. (Compl. ¶ 33; *see also id.* ¶ 35 (alleging shares fell after the January 2017 press release, "*further* damaging investors" (emphasis added)). As the Pension Fund points out, the Classen Plaintiffs themselves have filed a complaint in the Southern District of New York which, like the complaint in this action, *also* expressly refers to the October 2016 press release as a disclosure that caused a decline in BT Group's share price. *See Sarraf v. BT Group plc*, No. 17-cv-00558 (S.D.N.Y.), ECF No. 1 at ¶¶ 44–49 (describing October 2016 and January 2017 press releases as corrective disclosures revealing the truth and causing plaintiff's and class members' losses); *see also Hollister v. BT Group PLC, et al.*, No. 17-cv-00777 (S.D.N.Y.), ECF No. 1 at ¶ 66–67 (another related action, describing a 2.4% price drop "on heavy trading volume" in BT Group shares on October 27, 2016 as a "reaction" to the October 26, 2017 announcement of the Italian investigation).

Focusing as I must on the allegations in the complaint, I find that the allegations present a fairly straightforward (and not atypical) case of progressive revelation of a problem that turned out to be more serious than first believed. That the first, 2.39% drop had other causes is possible, but speculative at this point. I conclude that the Pension Fund is not likely to be subject to a unique loss causation defense that will become a major focus of the case.

I note also, as other courts have, that the Pension Fund is the kind of institutional investor that Congress specifically intended to encourage to serve as lead plaintiff when it enacted the PSLRA. *See, e.g., Grodko v. Cent. European Distribution Corp.*, No. CIV.A. 12-5530 JBS, 2012 WL 6595931, at *3 (D.N.J. Dec. 17, 2012) ("The PSLRA directs courts to identify the applicants with the greatest financial interest in the relief sought because Congress sought to encourage courts to choose institutional investors as lead plaintiffs: 'Both the Conference Committee Report and the Senate Report state that the purpose of the legislation was to encourage institutional investors to serve as lead plaintiff, predicting that their involvement would significantly benefit absent class members.'" (quoting *In re Cendant Corp. Litig.* 264 F.3d at 273)); *Juliar*, 2009 WL 1955237, at *2 (rejecting individual investors' rebuttal effort where presumptive lead plaintiff adequately alleged partial disclosure prior to its sale of shares and presumptive lead plaintiff was also a PSLRA-preferred institutional investor).

Finally, I take some comfort in the Pension Fund's offer to "include an additional class representative who held shares of BT Group through the final disclosure" in an amended complaint. (PF Reply 9) *Cf. In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 286 (S.D.N.Y. 2003) ("The PSLRA does not prohibit the addition of named plaintiffs to aid the Lead Plaintiff in representing the class. As discussed above, the PSLRA promotes the selection at an early stage of the litigation of an institutional investor with the largest financial stake in the action so that that investor can control the course of the litigation."). I agree that this should be done.

Accordingly, the Classen Plaintiffs have not rebutted the presumption that the Pension Fund, which suffered the greater dollar loss, should be appointed lead plaintiff. The contingencies, to be sure, are many. To the extent the representation structure proves inadequate to protect the rights of certain plaintiffs, I of course possess the authority to modify it. *Cf. Weiss*, 2006 WL 197036, at *5 ("The Court is aware that disagreements may arise throughout

this action, and as such, reserves the right to modify this lead plaintiff structure in the event that litigation is stalled, expenses become unnecessarily duplicative or wasteful, or the structure becomes otherwise unmanageable."); *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 541 (S.D.N.Y. 2015) ("If pre-trial discovery reveals rifts within the class that require subclasses, the issue will be addressed at that time."). But focusing as I must on the allegations of the complaint and the likely course of litigation, as it may be assessed at this very early stage, I find that the presumption has not been rebutted.

There being no other dispute as to the Pension Fund's satisfaction of Rule 23 or their selection of counsel, *see* 15 U.S.C. § 78u-4(a)(3)(B)(v) ("The most adequate plaintiff shall, subject to the approval of the court, select and retain counsel."), I will grant the Pension Fund's motion for appointment of itself as lead plaintiff and appointment of its counsel, Robbins Geller Rudman & Dowd LLP, as lead counsel. Also on the Pension Fund's motion, I will appoint Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C. as local counsel for the Pension Fund. The competing motion of the Classen Plaintiffs is accordingly denied.

DATED: August 28, 2017

**KEVIN MCNULTY**
**United States District Judge**

16