James E. Cecchi
CARELLA, BYRNE, CECCHI,
  OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ  07068
(973) 994-1700

Liaison Counsel for Plaintiffs

Samuel H. Rudman
David A. Rosenfeld
Alan I. Ellman
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
(631) 367-7100

Lead Counsel for Plaintiffs

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JAMES CHRISTIAN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. 2:17-cv-00497-KM-JBC |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) ) | AMENDED COMPLAINT FOR VIOLATIONS OF THE |
| BT GROUP PLC, IAN LIVINGSTON, GAVIN E. PATTERSON, TONY CHANMUGAM, and LUIS ALVAREZ, | ) ) ) ) | FEDERAL SECURITIES LAWS |
| Defendants. | ) ) ) | DEMAND FOR JURY TRIAL |

Lead Plaintiff PAMCAH-UA Local 675 Pension Fund and Plaintiff Clayton Hollister (together, "Plaintiffs"), on behalf of themselves and on behalf of all others similarly situated, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters based on the investigation conducted by their attorneys, which included, among other things, the review and analysis of: (i) U.S. Securities and Exchange Commission ("SEC") filings by BT Group plc ("BT Group" or the "Company"); (ii) transcripts of earnings calls with BT Group senior management; (iii) press releases, investor presentations, and other information issued or disseminated by the defendants; (iv) news articles and media coverage of the events giving rise to this action; and (v) research and reports by securities and financial analysts.

The investigation of Plaintiffs' attorneys is continuing, yet certain additional facts supporting these allegations are known only to the defendants or are exclusively within their custody or control.   Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **INTRODUCTION**

1.      This federal securities class action is brought on behalf of all purchasers of BT Group American Depositary Receipts ("ADRs") between May 10, 2013 and January 23, 2017, inclusive (the "Class Period").   The claims asserted are alleged against the Company and certain of its current and former executive officers and/or directors and managers (together, "Defendants," as further defined below), and arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.      This case arises from a massive accounting fraud at BT Group's Italian business. Defendants have now admitted that intentional misconduct occurred at BT Italia S.p.A. ("BT Italy"

or "BT Italia"), where improper accounting practices and a complex set of improper sales, purchase, factoring, and leasing transactions caused the Company's financial statements to be materially misstated for nearly a decade.  As a result of the intentional misconduct, BT Group has now conceded that its previously reported profits were overstated by ***£530 million*** (or approximately $700 million)[1] and has revised its historical financial statements to correct such misstatements.  Further, the Company's internal controls over financial reporting – which Defendants Ian Livingston, Gavin E. Patterson, and Tony Chanmugam personally designed and evaluated, or caused to be designed and evaluated under their supervision – were falsely certified as effective and containing no material weaknesses.

3.      Contrary to these defendants' sworn certifications, the Company's internal controls contained the following material weaknesses: (1) individuals in Italy colluded to override the period-end financial controls and overstate results; (2) the Company's monitoring controls, which include the review of reconciliations, journals, results, and financial position, did not operate effectively to identify the overstatement in a timely manner; and (3) the Company did not maintain effective controls to prevent or detect the collusive circumvention or override of controls related to BT Italy.

4.      As a result, the Company terminated BT Italy's Chief Executive Officer ("CEO"), Chief Operating Officer ("COO"), and at least three other BT Italy employees.  BT Group also filed a criminal complaint with Italian prosecutors against those five executives.  The CEO of BT Group's Global Services division and the President of BT Global Services in Continental Europe also abruptly left the Company in the wake of the accounting scandal.  In addition, BT Group

---

[1]     As of the date of this filing, 1 British Pound is equal to 1.32 U.S. Dollars.

dramatically slashed the compensation of its top executives to reflect the true amounts they should have been paid absent the accounting fraud: Defendant Patterson's total remuneration was cut from £5.28 million in fiscal 2016 to £1.34 million in fiscal 2017, and Defendant Chanmugam's total remuneration was cut from £2.81 million in fiscal 2016 to £258,000 in fiscal 2017.

5.    The financial fallout associated with the Company's Italian scandal was telling, with BT Group's ADRs declining by more than 20%, enough to eviscerate some *£8 billion* in market capitalization. Indeed, the magnitude of the diminution in the Company's market value, which is approximately *15 times* greater than the £530 million profit overstatement itself, demonstrates the significance of BT Group's malfeasance.

6.    The materiality of the fraudulent scheme is further demonstrated by PricewaterhouseCoopers LLP ("PwC"), BT Group's outside auditor during the Class Period, which determined that the threshold for overall Company-level materiality was £130 million. BT Group's £530 million in adjustments due to the fraud at BT Italy far exceeds that threshold.

7.    Indeed, the public disclosure of an alarming web of collusion and intentional wrongdoing, which ranged from over-aggressive assumptions to off-balance sheet structures designed to bring cash onto the balance sheet in time to meet targets, has shaken the market's confidence in BT Group management's integrity, its representations about the Company's reported operating results, and its ability to manage the Company's global operations, particularly because it operates in 180 countries across the globe.

8.    As detailed herein, BT Group's Audit & Risk Committee was actually aware of sustained problems in the internal control environment of BT Italy throughout 2013, 2014, 2015, and 2016, and cryptically reported the existence of questionable practices in the Company's annual reports, which Defendants reviewed and approved. Despite this knowledge, Defendants

Livingston, Patterson, and Chanmugam falsely certified that BT Group's internal controls were operating effectively while, in fact, a massive financial fraud was on-going in Italy.

9.      In addition, in November 2015, three BT Italy employees warned BT Group's Vice President of Iberia and head of European sales about possible accounting problems at BT Italy, bullying by BT Italy management, especially its then-CEO, and pressure to meet difficult bonus targets.

10.     Accordingly, the scienter of management-level executives of BT Group is imputed to the Company.

11.     BT Group also faces a government investigation.  In connection with the admitted fraud, the Italian law enforcement agency responsible for investigating financial crimes has been conducting an investigation into the wrongful conduct at BT Group.

12.     As a result of Defendants' wrongful acts and omissions, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

14.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa], and 28 U.S.C. §§1331 and 1337.

15.     Venue is properly laid in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).  The acts and transactions giving rise to the violations of law complained of occurred in part in this District.   The false and misleading statements were

disseminated in this District, and therefore the fraudulent conduct was carried out in part in this District.

16.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the New York Stock Exchange ("NYSE"), a national securities exchange.

## PARTIES

17.     Lead Plaintiff PAMCAH-UA Local 675 Pension Fund[2] purchased BT Group ADRs, as set forth in the certification previously filed with the Court and incorporated herein by reference, and was damaged thereby.

18.     Plaintiff Clayton Hollister purchased BT Group ADRs, as set forth in the certification attached hereto and incorporated herein by reference, and was damaged thereby.

19.     Defendant BT Group is a multinational telecommunications services company that offers fixed-line services, broadband, mobile and TV products and services, and networked information technology ("IT") services in the United Kingdom and across the world.  The Company is headquartered in London, United Kingdom.  BT Group's ADRs are traded on the NYSE.[3]

20.     Defendant Ian Livingston ("Livingston") was the Company's CEO and a member of BT Group's Board of Directors (the "Board") from 2008 until September 2013.

---

[2]     PAMCAH-UA is an acronym for Plumbing & Mechanical Contractors Association of Hawaii-United Association.

[3]     BT Group's fiscal year ends on March 31.  By way of example, the twelve months beginning April 1, 2015 and ending March 31, 2016 are considered the Company's fiscal year 2016.

21.     Defendant Gavin E. Patterson ("Patterson") has been the Company's CEO and a member of the Board from September 2013 to the present.

22.     Defendant Tony Chanmugam ("Chanmugam") was BT Group's Group Finance Director[4] and a member of the Board from 2008 until July 2016.

23.     Defendant Luis Alvarez ("Alvarez") was, from 2012 until May 2017, the CEO of BT Group's Global Services division and, in that position, oversaw the Company's BT Italy segment.  On May 11, 2017, the Company announced that Alvarez left, or was leaving, BT Group. From at least fiscal year 2013 through fiscal year 2016, Alvarez was a member of the Company's Operating Committee, which BT Group describes as "the key management committee," with responsibility for running BT Group's business and delivering its strategy.   The Operating Committee meets weekly and is chaired by the Company's CEO.

24.     Defendants Livingston, Patterson, Chanmugam, and Alvarez  are referred to herein as the "Individual Defendants."  BT Group and the Individual Defendants are referred to herein, collectively, as "Defendants."

25.     During the Class Period, Defendants, as senior executive officers and/or directors of BT Group, were privy to confidential and proprietary information concerning BT Group, its operations, finances, financial condition, and present and future business prospects.  Because of their positions with BT Group, Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects *via* internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof

---

[4]    Upon information and belief, the position of Group Finance Director at BT Group is equivalent to the position of Chief Financial Officer ("CFO") at most U.S. public companies.

and *via* reports and other information provided to them in connection therewith.  Because of their possession of such information, Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

26.     Defendants are liable as direct participants in the wrongs complained of herein.  In addition, Defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, Defendants were able to and did, directly or indirectly, control the conduct of BT Group's business.

27.     Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of BT Group's reports, press releases, and presentations to securities analysts, and through them, to the investing public.  Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, Defendants had the opportunity to commit the fraudulent acts alleged herein.

28.     As controlling persons of a publicly traded company whose stock was registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE and governed by the federal securities laws, Defendants had a duty to promptly disseminate accurate and truthful information with respect to BT Group's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of BT Group ADRs would be based upon truthful

- 7 -

and accurate information.  Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

29.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of BT Group ADRs by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding BT Group's business, operations, and the intrinsic value of BT Group ADRs; and (ii) caused Plaintiffs and other members of the Class to purchase BT Group ADRs at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

30.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and all purchasers, other than Defendants, of BT Group ADRs during the Class Period (the "Class").

31.     Excluded from the Class are Defendants herein, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director, or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

32.     The members of the Class are so numerous that joinder of all members is impracticable.  The precise number of Class members is unknown to Plaintiffs at this time, but is believed to be in the thousands.  In addition, the names and addresses of the Class members can be ascertained from the books and records of BT Group or its transfer agent.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using

techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

33.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and to prosecute this action vigorously.

34.     Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs' and Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants.  Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

35.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to seek redress for the wrongful conduct alleged.  Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

36.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants during the Class Period were materially false and misleading;

(c)      whether the price of BT Group ADRs was artificially inflated during the Class Period; and

(d)      the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

37.      Defendant BT Group, formerly known as British Telecom, describes itself as one of the world's leading providers of communications services and solutions, serving customers in 180 countries.  Its principal activities include the provision of networked IT services globally; local, national and international telecommunications services to its customers for use at home, at work and on the move; broadband, TV and internet products and services; and converged fixed-mobile products and services.

38.      BT Group consists of six customer-facing lines of business: Global Services ("BT Global Services"), Consumer, EE, Business and Public Sector, Wholesale and Ventures, and Openreach.  BT Global Services contributes the largest percentage of revenue to BT Group from among these six lines of business.   BT Global Services provides technology consulting, outsourcing, and communications systems for more than 10,000 organizations and governments worldwide.  Defendant Alvarez became CEO of BT Global Services in 2012.  During the Class Period, Corrado Sciolla ("Sciolla") was president of BT Global Services in Continental Europe, which includes BT Italy.

39.      BT Italy is the second-largest business telecommunication operator in the Italian market and purportedly "one of the leading service providers [of] integrated IT and IT solutions dedicated to businesses and public organizations" in Italy.  Headquartered in Milan and employing approximately 1,200 people in Italy, BT Italy came about following a string of mergers and tie-

ups that started between BT Group and local operators in the 1990s.  BT Italy was formed in 1995 under the Albacom brand (becoming BT Italy in 2006).  BT Italy supports customers in three main areas: Digital Customers, Digital Business, and Digital Employee.

**Throughout the Class Period, Defendants Were Aware of Problems with the Control Environment at BT Italy**

40.     By no later than the beginning of the Class Period, Defendants knew that BT Group's operations in Italy suffered from control problems.  Since fiscal year 2013, the year ended March 30, 2013, BT Group's Audit & Risk Committee ("Audit Committee") had been continually assessing the "control environment" in Italy.  Although Defendants opaquely referenced control problems at BT Italy in the Company's SEC filings, and despite the rampant fraud taking place at BT Italy at that time, Defendants Livingston, Patterson, and Chanmugam nevertheless falsely certified the efficacy of BT Group's internal controls.

41.     For example, in BT Group's 2013 annual report, filed on May 23, 2013 with the SEC on Form 20-F (the "2013 Annual Report"), Nick Rose ("Rose"), Chairman of the Audit Committee, noted that the Audit Committee had given particular focus to BT's operations in Italy.  Rose stated, in pertinent part, as follows:

**Internal controls and risk management**

We give risk management special attention and during the year we heard from each line of business CEO on the key risks in their part of the business, as well as the actions they are taking to address them.  We aim to cover all significant risks to the group not just the financial risks.  One of our meetings focused solely on risk at which the Chief Executive discussed the group's enterprise-wide risk management processes, and the key risks facing the group as a whole.  We reviewed the internal control requirements under the Code including the risk management processes. You can find details of the Board and our review of the group's systems of internal control and risk management on page 95.

> ***We received updates on*** security and resilience, cyber security, BT's networks, major contracts, ***BT's operations in Italy***, customer data handling, litigation trends, as well as updates on major litigation and competition and regulation.[5]

42.      In BT Group's 2014 annual report, filed on May 22, 2014 with the SEC on Form 20-F (the "2014 Annual Report"), Rose highlighted the amount of attention that the Audit Committee had been focusing on BT Group's operations in Italy.  Rose stated, in pertinent part, as follows:

> ***This year the Audit & Risk Committee paid special attention to several overseas locations that are important to BT Global Services, including Italy*** and Brazil, to data security and to the increasing cyber security threat.  We have received detailed presentations from key personnel in each of these areas and reviewed management's mitigation plans.

43.      Rose pinpointed the problems in the control environment at BT Group's Italian operations as a source of concern for the Audit Committee.  Rose stated, in pertinent part, as follows:

> ***I reported last year that the committee had given particular focus to BT's operations in Italy. We have continued to monitor the position there and significant progress has been made to improve the control environment***.

44.      In BT Group's 2015 annual report, filed on May 21, 2015 with the SEC on Form 20-F (the "2015 Annual Report"), Rose again highlighted the amount of attention that the Audit Committee had been giving to BT Italy.  Rose stated, in pertinent part, as follows:

> ***I reported last year that the committee had given particular focus to BT's operations in Italy and Brazil. We have continued to monitor the position and significant progress has been made to improve the control environment***.  We continue to keep under review the current trends of security risks facing BT and the progress made to manage these risks.

---

[5]   Unless otherwise noted, emphasis is added throughout.

45.     Rose also explained that the Audit Committee had an annual work plan, which, in fiscal year 2015, sought greater detail on the governance and control of the Company's operations in Italy.  Rose stated, in pertinent part, as follows:

> The committee has an annual work plan.  This includes standing items that we consider regularly, in addition to any specific matters that need the committee's attention and topical items on which we chose to focus.  ***For example, in 2014/15 we asked management to provide us with greater detail on the governance and control in relation to*** the BDUK regional fibre deployment programme, the finance transformation programme, ***operations in Italy*** and Latin America and reports on customer data handling, data security and cyber security.

46.     Underscoring the Company's growing concerns with its Italian operations, BT Group's Chairman, Michael Rake, stated that the Board's focus for fiscal year 2015 had been, among other things, "a visit to BT's business in Italy."  The Company explained that the Board of Directors visited the Italy business – the only visit outside of the U.K. specified in the Annual Report.  The Company stated, in pertinent part, as follows:

> ***We visited our Italy business, and while there we reviewed operational matters with senior managers, met with employees as well as customers, government officials and opinion leaders***.  We also visited Openreach to see customer service in action and spent time on site visits with our engineers.[6]

47.     In BT Group's 2016 annual report, filed on May 19, 2016 with the SEC on Form 20-F (the "2016 Annual Report"), the Company again implicitly admitted that the control environment at BT Italy suffered from unspecified problems.  Rose stated, in pertinent part, as follows:

> ***We have continued to monitor our operations in Italy and progress has been made to improve the control environment***.  We continue to keep under review the current trends of security risks facing BT and the progress made to manage these risks.

---

[6]    Openreach's headquarters is located in London.

48.     In an analyst report dated June 9, 2016, HSBC Global Research noted the Audit Committee's unusual level of review of the Italy operations over the previous four years.   The HSBC analyst stated, in pertinent part, as follows:

> *The Board's Audit Committee notes that the 'Control environment' in Italy remains under review.  This has been under continual assessment since FY13, and no further detail has ever been provided.   Other countries have been monitored, but none have had this sustained level of review*.

**The Truth Begins to Emerge**

49.     On October 27, 2016, BT Group issued a press release announcing its financial results for the fiscal second quarter, the period ending September 30, 2016.   For the quarter, the Company reported revenue of £6,007 million, EBITDA of £1,888 million,[7] operating profit of £1,019 million, profit before tax of £873 million, and adjusted earnings per share of 7.2p.

50.     However, BT Group announced that the Company would have to take a write-down of £145 million (or approximately $191 million) due to "certain historical accounting errors" at its BT Italy division.   In that regard, the press release stated, in pertinent part, as follows:

*BT Italia investigation*

Following allegations of ***inappropriate management behaviour in our BT Italia operations***, we have conducted an initial internal investigation.   This included a review of accounting practices during which we have identified certain historical accounting errors and reassessed certain areas of management judgement.

We have written down the value of items on the balance sheet by £145m.  This is our current best estimate of the financial impact based on our internal investigation.  The write down relates to balances that have built up over a number of years and our assessment is that the errors have not materially impacted the group's reported earnings over the previous two years.   The amount has been charged as a specific item in our results for the quarter.   As a non-cash item in the period it does not impact normalised free cash flow.

---

[7]     EBITDA is an acronym for earnings before interest, taxes, depreciation, and amortization.

A full investigation of these matters is ongoing and we have appointed external advisers to assist with this.  Appropriate action will be taken as the investigation progresses.

Our outlook is not affected.

51.     In reaction to these announcements, on October 27, 2016, the price of BT Group ADRs fell $0.57 per ADR, or 2.4%, to close at $23.25 per ADR, on heavy trading volume. However, the Company continued to conceal the true extent of its problems.

52.     On January 24, 2017, the Company issued a press release announcing an update of its investigation into its Italian business and on the Company's outlook.  While the October write-down of Italian operations was only £145 million, an amount the Company said would not affect its full-year financial targets, the Company increased the write down to £530 million (or approximately $700 million), a nearly four-fold increase.  Additionally, the Company stated that it now did not expect revenue to grow for the next two years after earlier forecasting it would, and estimated 2016-2017 free cash flow at £2.5 billion, as much as £700 million below the original forecast.

53.     BT Group explained that its investigations had revealed that "the extent and complexity of inappropriate behaviour in the Italian business were far greater than previously identified" and had "revealed improper accounting practices and a complex set of improper sales, purchase, factoring and leasing transactions," resulting in the "overstatement of earnings in our Italian business over a number of years."  The Company stated, in pertinent part, as follows:

Since [the October 27, 2016 press release] we have progressed the investigation, which has included an independent review by KPMG LLP of the accounting practices in our Italian operations and our own comprehensive balance sheet review.  These investigations have revealed that *the extent and complexity of inappropriate behaviour in the Italian business were far greater than previously identified* and have *revealed improper accounting practices and a complex set of improper sales, purchase, factoring and leasing transactions*.  These activities

have resulted in the *overstatement of earnings in our Italian business over a number of years*.

The investigation into the financial position of our Italian business is now substantially complete.  *The adjustments identified have increased from the £145m announced in our half-year update to a total of around £530m*.  We are still evaluating what proportion of the total adjustments should be treated as prior year errors, and what proportion should be treated as the reassessment in the current year of management estimates.  Work is also ongoing to establish how these adjustments should be reflected in BT Group's financial statements for the current and previous periods in light of applicable accounting requirements.

In addition, we would expect the matters described above to result in a reduction in our Q3 adjusted revenue and adjusted EBITDA of around £120m, and in a reduction in Q3 normalised free cash flow of around £100m.  For 2016/17 as a whole, relative to our prior outlook, we would expect a decrease in adjusted revenue of around £200m, in adjusted EBITDA of around £175m, and of up to £500m of normalised free cash flow due to the EBITDA impact and the one-off unwind of the effects of inappropriate working capital transactions.  For 2017/18, we would expect a similar annual impact to adjusted revenue and adjusted EBITDA as in 2016/17, with the EBITDA impact flowing through to normalised free cash flow. An updated outlook for the Group reflecting the above and other matters is set out below.

The EBITDA contribution of the Italian business included in the Group's reported EBITDA for the financial year ended 31 March 2016 was around 1%.

The improper behaviour in our Italian business is an extremely serious matter, and we have taken immediate steps to strengthen the financial processes and controls in that business.  *We suspended a number of BT Italy's senior management team who have now left the business.  We have also appointed a new Chief Executive of BT Italy who will take charge on 1 February 2017.  He will review the Italian management team and will work with BT Group Ethics and Compliance to improve the governance, compliance and financial safeguards in our Italian business*.

Further, we are conducting a broader review of financial processes, systems and controls across the Group.  The BT Group Remuneration Committee will consider the wider implications of the BT Italy investigation.

54.     With regard to the Company's investigation and subsequent write-down, Defendant

Patterson stated, in pertinent part, as follows:

We are deeply disappointed with the improper practices which we have found in our Italian business.  We have undertaken extensive investigations into that business and are committed to ensuring the highest standards across the whole of

BT for the benefit of our customers, shareholders, employees and all other stakeholders.

55.     The same day, BT Group held a conference call with analysts and investors to discuss its investigation into the Italian business.  In response to a question concerning the nature of the Company's unwinding of improper working capital transactions, Simon Lowth, the Company's current Group Finance Director, explained how BT Italy employees had engineered improper factoring transactions.[8]  Lowth stated, in pertinent part, as follows:

> The majority component [of unwinding the improper working capital transactions] was to repay essentially **working capital loans to factoring companies where loans had been taken against receivables and, indeed, had been taken to pay suppliers. Those working capital loans [were] clearly improper and we are unwinding them, and that is overwhelmingly the most significant contributor to the onetime cash unwind in the 2016/2017**.
>
> There are some additional smaller contributors in unwinding some of the improper transactions such as sale and leaseback transactions which we have identified.[9]  But the main component is to unwind the inappropriate improper working capital loans. So the beneficiaries, to be specific, are the factoring companies who had extended those loans.

56.     In response to another question about the immense scale of improper factoring that had been going on in the Italian business, Lowth stated, in pertinent part, as follows:

> [T]here are some genuine and sensible business reasons why companies will, from time to time, factor some elements of receivables, and that is a practice that is common in Italy.  And it is a practice that has been undertaken by BT Italia in the

---

[8]   Factoring is a commercial transaction in which an entity transfers its trade receivables to a third party, generally a financial organization, to obtain cash on an immediate basis.  According to the *Financial Times,* and as explained herein, BT Italy's management obtained loans on existing receivables and used the amounts received therefrom to reduce the existing receivable balances **without** recording the loans that produced the cash it received.

[9]   Generally, a "sale/leaseback," or sale and leaseback transaction, is one in which the owner of a property sells an asset, typically real estate or equipment, and immediately leases that same property back from the buyer for a specified time period.  Typically, a seller (here, BT Group) enters into a sale/leaseback transaction to generate cash flow from appreciated long-term assets and still retain the right of use.  According to *Reuters*, and as explained herein, BT Group contrived sale-and-leaseback transactions to artificially inflate BT Italy's sales and profit margins.

past.  *The practices that we note here, and that we are unwinding, are more extensive receivables factoring often against inappropriate customer bases and debt*.

*And, secondly, more material here I'm afraid, was the factoring activity against payables, in effect, taking out working capital loans in order to settle creditors. And that is not a practice that we would tolerate anywhere in BT*.

57.    During the conference call, Patterson and Lowth had an exchange with a securities

analyst concerning the surprising magnitude of the write-down to EBITDA, stating, in pertinent

part, as follows:

**James Ratzer** - *New Street Research LLP* - Analyst

So just trying to get my head again around the magnitude of the GBP175 million hit to EBITDA from Italy, given you're disclosing that the business was doing around GBP65 million of EBITDA previously, I was just trying to [confirm], that's almost a tripling of the EBITDA impact from the performance in 2015/2016. I'd just like to get a waterfall on why the impact to EBITDA is so big. . . .

**Gavin Patterson** - *BT Group plc* - CEO

Lots of questions there; let me see if I can pick off some of them.  First of all our commitment to global services, it's a very disappointing situation in Italy; I can't underline that enough.  It is a complex situation that involved a lot of people.  It's been going on for a number of years.  It's very, very disappointing.

*That has taken a business that we thought was profitable but, in truth, has probably been unprofitable for a number of years*.  That's why you're seeing such a significant swing of GBP175 million. . . .

**Simon Lowth** - *BT Group plc* - Group Finance Director

Just to finish on the first part of your question, the EBITDA in Italy was slightly higher than the number you'd suggested, another GBP20 million, GBP30 million or so.  *And the impact of the GBP175 million is because the result of the improper accounting, the improper transactions, was to significantly understate the costs in the business, some of which was being capitalized and, therefore, not running through EBITDA.  Other parts of it were simply costs that were not being accrued properly into the accounts*.

The impact, therefore, is greater than the previously reported EBITDA.

- 18 -

58. Moreover, on January 24, 2017, in an article entitled "Dodgy Italian Job Savages BT Earnings, Share Price Tanks," *LightReading*, a communications-industry networking website, reported that BT Group suspended a number of senior executives in Italy, including Gianluca Cimini ("Cimini"), the former BT Italy CEO, and Stefania Truzzoli ("Truzzoli"), BT Italy's COO, and appointed a new CEO for BT Italy.  On that same day, in an article entitled "BT European Chief to Resign Over Italian Scandal," the *BBC* reported that Corrado Sciolla, President of BT Global Services – Continental Europe, was expected to resign shortly.  Sciolla had previously been CEO of BT Italy from 2006 until January 2013.

59. In reaction to these disclosures, on January 24, 2017, the price of BT Group ADRs fell $5.05 per ADR, or approximately 21%, to close at $19.38 per ADR, on extremely heavy trading volume.

60. On January 27, 2017, BT Group held an earnings conference call with analysts and investors to discuss BT Group's financial performance for the fiscal third quarter of 2017.  During the call, Patterson stated: "*EBITDA was down 78% reflecting the impact of Italy*.  That was taken in the quarter.  *Excluding the Italian business, EBITDA was down 8%*."

61. On January 28, 2017, the U.K.'s *Telegraph* reported that a KPMG LLP ("KPMG") investigation found that *the misconduct at BT Italy had been going on for most of the past 10 years*.

**A BT Group Vice President Was Informed of Accounting Problems, Bullying and Pressure to Meet Difficult Bonus Targets at BT Italy in November 2015**

62. On March 30, 2017, *Reuters* reported that in November 2015, three BT Italy employees warned their Madrid-based supervisor, BT Group head of European sales Jacinto

Cavestany,[10] about possible accounting problems at BT Italy.  The source told *Reuters* that he and

two BT Italy colleagues had met Cavestany on the sidelines of a Company gathering in Munich,

Germany in November 2015.  The three told Cavestany that they were worried something was

wrong with the unit's financial results.  They also complained to Cavestany of bullying by local

management, especially by then-BT Italy CEO Cimini, and pressure to meet difficult bonus

targets, the source said.  The source added that Cavestany had replied that the three should help

him to steer Cimini "in the right direction."

63.     In January 2017, however, BT Group had claimed that it began an internal

investigation after receiving allegations in late summer 2016 of inappropriate behavior at BT Italy

*– almost a year after the Munich meeting with Cavestany*.

64.     BT Group also said in response to *Reuters*' questions that it had received complaints

of what it called bullying at BT Italy earlier in 2016.  It said senior company representatives had

visited the Italian business and looked into the issue.  According to a person familiar with BT

Group's internal investigation, the probe – codenamed Project Crane – began as an inquiry into

bullying and interviewed about 40 employees.  It concluded that Italian management had been

responsible for "bullying and inappropriate behavior," according to a one-page summary of the

findings reviewed by *Reuters*.

65.     According to *Reuters*, the source involved in the Munich meeting, as well as four

current employees not involved in that meeting, also laid out certain details of how they say the

deception worked.  The five sources said a network of people at BT Italy had exaggerated revenues

from certain BT-installed phone lines, faked contract renewals and invoices, and invented bogus

---

[10]   According to his LinkedIn profile, Cavestany has held the title "VP Iberia & Head of Sales
Europe and Latam [Latin America]" from January 2014 through the present.

supplier transactions in order to meet bonus targets and disguise the unit's true financial performance. ***All of these practices had been going on since at least 2013***, they added.

66.      *Reuters* reported that two sources familiar with a report prepared by KPMG as part of its independent review said KPMG had found these same types of irregularities.

67.      For example, BT Italy earned income from toll-free hotlines provided to corporate clients.  This income varied according to how much traffic a hotline carried: the busier the line, the more money a client paid to BT Italy.  According to four of the sources, client-account managers exaggerated hotline traffic by misstating them in internal records.  They did this in order to meet aggressive internal targets and collect their bonuses, they added.  Clients were unaware of the deception and only paid revenues due on the actual traffic recorded, they said.

68.      BT Italy's purchasing office also colluded to mask the true state of the business, making fake purchase orders to suppliers with no intention of receiving goods, four sources said. No cash changed hands, but BT Italy would suddenly cancel the order and ask the supplier to issue a credit note by way of a refund, these sources said.  Some bogus credit notes were then sold to a factoring company for cash, said one of the sources, a current client-account manager at BT Group.

69.      One current employee said multiple internal accounting systems, a legacy of BT Group acquisitions in Italy, enabled staff to inflate revenues by entering two duplicate invoices for the same client. The genuine invoices were entered into one system and mailed to clients; the duplicates went into another system, according to this source.

70.      A source familiar with an investigation by Italian prosecutors said the accounts of the former and current employees matched the prosecutors' findings on the practice of faking income.

71.     The deception took place in an atmosphere in which employees were criticized and shouted at by a few top managers in front of colleagues for failing to meet targets, all five BT Italy sources said.  They said the pressure to hit targets rose after Cimini became the unit's chief executive in April 2013; he was formerly its CFO.  For example, the current BT Italy client-account manager said his 2016-17 goals, set early in 2016, required him to more than double overall revenues from his clients.  In a staff meeting in Milan, one eyewitness source said, Cimini spoke about the need to meet targets and demonstrated how no employee was indispensable.  He dipped a finger into a glass of water and remarked: "What happens if I put my finger inside and take it out? Absolutely nothing – the same if you left the company."

**BT Group Filed a Criminal Complaint Against Five Former Employees**

72.     On April 21, 2017, *Reuters* reported that BT Group itself filed a criminal complaint with Italian prosecutors on March 21, 2017 over the accounting scandal, accusing several former BT Italy executives and other employees of breaking company rules and unlawful conduct. *Reuters* first saw the complaint, which typically is not a document that is made publicly available, in mid-April.

73.     As described by *Reuters*, BT Group's complaint alleges misconduct against three former senior executives of BT Italy and two other former employees.  It alleges former BT Italy CEO Cimini was responsible for grave violations of corporate governance rules in relation to contracts and suppliers, and for using intimidating behavior when dealing with staff.  It alleges former COO Truzzoli manipulated results that were used to award staff bonuses and that she also manipulated data that was communicated to BT Europe during the internal presentation of results.

74.     The BT Group complaint also alleges former BT Italy CFO Luca Sebastiani ("Sebastiani") failed to report financial irregularities to his managers and also induced an employee

responsible for invoicing at BT Italy, Giacomo Ingannamorte ("Ingannamorte"), to issue fake invoices. It further alleges Luca Torrigiani ("Torrigiani"), formerly responsible for government clients and other large accounts in Italy, violated BT Group's rules in the manner in which he chose suppliers and for receiving a payment from an agent of BT Italy. The complaint said Cimini, Truzzoli, Sebastiani, Ingannamorte, and Torrigiani were all fired.

75.     In May 2017, Defendant Alvarez, CEO of BT Global Services, which includes the Italy unit, left the Company. Alvarez had been in that role since October 2012 and with BT Group since 1999.

**BT Group Faces an Italian Government Investigation**

76.     BT Group also faces a government investigation by the Guardia di Finanza, an Italian law enforcement agency responsible for dealing with financial crimes. The Company's director of ethics and compliance, Gareth Tipton, met Italian magistrates in Milan in the second half of February 2017, two sources with knowledge of the investigation told *Reuters*. BT Group also gave prosecutors computer records collected during an internal investigation at the Italian unit in late summer 2016, the sources said. In May 2017, the Guardia di Finanza raided BT Italy's office in Milan and seized boxes of documents. Italian authorities started interviewing former BT employees in June 2017.

77.     On July 1, 2017, the *Financial Times* reported that raids had been carried out in May at key BT Group suppliers, including IBM, building products supplier ITF Srl and IT company Var Group. According to the *Financial Times*, none of the suppliers raided in May is under investigation but prosecutors have said that they are looking at whether some purported BT Italy transactions involving them were fake. The Guardia di Finanza is scrutinizing a number of transactions, including a so-called "leaseback" deal in 2015 between BT Italy, ITF, and a unit of

IBM, according to a person with direct knowledge of the investigation.  Citing a person with "direct knowledge" of Guardia di Finanza's investigation, the *Financial Times* reported that BT Italy sold equipment to ITF for approximately €32 million and ITF then sold the equipment to IBM, which then leased the equipment back to BT Italy for approximately €36 million.[11]  The transaction involved approximately 80,000 pieces of gear, including computers and servers.  But BT Group has not been able to locate serial numbers for all of the equipment, which has led Italian prosecutors to probe whether the entire transaction may have been fake.  It is unclear why BT Group would have pursued a deal in this way.

78.  At the heart of the case, according to the *Financial Times*, Italian investigators are scrutinizing the actions of Cimini, Truzzoli, and Ingannamorte, as well as other former employees in the division.  They are being investigated in connection with allegations of fraud, double billing, fake contract renewals, inflated revenues, bogus transactions linked to bonus targets, and concealment of BT Italy's real financial performance, according to two people with direct knowledge of the case.

**BT Group Provided the Details of Its Financial Improprieties in the 2017 Annual Report**

79.  On May 25, 2017, BT Group filed its 2017 annual report with the SEC on Form 20-F (the "2017 Annual Report"), setting forth the details of the Company's admissions associated with its financial improprieties during the Class Period.  The Company stated that adjustments relating to the investigation of its Italian business amounted to £268 million for errors in prior years, for which it revised prior periods, a specific-item charge of £245 million for changes in accounting estimates, and a charge for investigation costs of £15 million.  The Company also stated

---

[11]   As of the date of this filing, 1 Euro is equal to 1.17 U.S. Dollars.

that correction of the full £268 million in the current year would materially misstate the current year.

80.     In the 2017 Annual Report, BT Group discussed the findings of its investigation of BT Italy, stating, in pertinent part, as follows:

> During the year we identified inappropriate behaviour in our Italian business. Our investigation identified **collusion and override of controls within our Italian business** and that **our monitoring controls did not identify the circumvention and override**, resulting in the misstatement of results going undetected for a number of years.  As a result of our US listing we are required to make certain assessments of our controls as of 31 March 2017 for the purposes of Sarbanes-Oxley.  Despite the remediation steps we took, the controls had not operated for sufficient time to allow assurance testing to confirm their effectiveness under Sarbanes-Oxley.  We have therefore concluded for these purposes that our controls were ineffective as of 31 March 2017 due to a material control weakness with regard to our Italian business.

81.     The Company also explained its response to the fraud identified during the investigation.  BT Group stated, in pertinent part, as follows:

> **BT Italy – our response**
>
> In response to the inappropriate behaviours we identified in our Italian business, we suspended a number of BT Italy's senior management team who have now left the business.  The president of our European operations has also left the business.  We have appointed a new president of our European operations and a new CEO and CFO of BT Italy, from outside the Italian executive management team.
>
> We appointed KPMG, with support and oversight from our Legal, Governance and Compliance function and Freshfields Bruckhaus Deringer, reporting directly to both the chair of the Audit & Risk Committee and BT Group chairman, to perform an independent investigation of the systems and controls relating to our Italian business.  We also conducted a broader review of financial processes, systems and controls across the group.  We are acting on both the recommendations of KPMG and our own observations and have taken steps to improve our controls within Italy.  We have also taken steps to enhance our wider controls that monitor our overseas operations in our shared service centres, Global Services and at a group level.
>
> *         *         *
>
> The new CEO and CFO of BT Italy will continue to review the Italian management and finance teams and work with BT Group Ethics and Compliance to improve the governance, compliance and financial safeguards.  Going forward, we will also continue to rotate senior management among countries to ensure an independently

governed and rigorously controlled organisation throughout all parts of Global Services.

82.     The Company also stated that its operating cash outflow of £245 million was £396 million worse than the previous year, as it had unwound the effects of improper working capital transactions in its Italian business.

83.     In the 2017 Annual Report, BT Group provided a summary of adjustments reconciling the fiscal 2016 and fiscal 2015 financial years from previously published to the revised position reflecting the three prior year revisions.  The Company presented the adjustments to its Group income statement as follows:

| For the year ended 31 March 2016 | As published £m | Italian business adjustment £m | Revised £m |
|---|---|---|---|
| Revenue | 19,042 | (30) | 19,012 |
| Operating costs | (15,307) | (92) | (15,399) |
| Operating profit | 3,735 | (122) | 3,613 |
| Profit before tax | 3,029 | (122) | 2,907 |
| Profit for the period | 2,588 | (122) | 2,466 |
| Earnings per share – basic | 29.9p | (1.4) p | 28.5p |
| Earnings per share – diluted | 29.6p | (1.4) p | 28.2p |

| For the year ended 31 March 2015 | As published £m | Italian business adjustment £m | Revised £m |
|---|---|---|---|
| Revenue | 17,979 | (11) | 17,968 |
| Operating costs | (14,499) | (67) | (14,566) |
| Operating profit | 3,480 | (78) | 3,402 |
| Profit before tax | 2,645 | (78) | 2,567 |
| Profit for the period | 2,135 | (78) | 2,057 |
| Earnings per share – basic | 26.5p | (1.0) p | 25.5p |
| Earnings per share – diluted | 26.1p | (1.0) p | 25.1p |

**BT Group Clawed Back the Pay of Defendants Patterson and Chanmugam**

84.     As a result of the fraud emanating from BT Italy and reaching the upper echelons of the Company, BT Group clawed back previously awarded bonuses (known as "malus") and

- 26 -

denied bonuses for the current year to the Company's executive directors, including Defendants Patterson and Chanmugam.  In the 2017 Annual Report, Tony Ball, Chairman of the Company's Remuneration Committee, stated that this action ensured the restitution of overpayments to these recipients and ***placed them in the same position they would otherwise have been in had the awards been based on the revised results, as opposed to the results artificially inflated by fraud***.  The Company stated, in pertinent part, as follows:

> **Application of malus due to Italian issues**: In January we published revised results for 2014/15 and 2015/16 after our investigations into accounting irregularities in our Italian business.  ***The [Remuneration] committee has recalculated the annual bonuses for the years in question and the outcome of vesting for the 2013 ISP to reflect the revised results.  This clearly showed that the payouts based on the revised results would have been lower than those actually paid at the time***.

> The committee has therefore decided to exercise its discretion and apply the malus provisions in the Deferred Bonus Plan to reduce the number of shares under award, for the executive directors, plus the Operating Committee members who received payments under the bonus arrangements and/or the ISP, and for the company secretary.  ***This action ensures the restitution of overpayments to these recipients and places them in the same position they would otherwise have been in had the awards been based on the revised results***.

85.     According to the 2017 Annual Report, Patterson's total remuneration was cut from £5.28 million in fiscal 2016 to £1.34 million in fiscal 2017.  Chanmugam's total remuneration was cut from £2.81 million in fiscal 2016 to £258,000 in fiscal 2017.[12]

86.     The Company also applied the malus provisions in its Deferred Bonus Plan, causing shares granted to Patterson and Chanmugam in 2014, 2015, and 2016 to lapse.  The Company stated, in pertinent part, as follows:

---

[12]   According to the 2017 Annual Report, Chanmugam retired from BT Group on July 13, 2016. Under the terms of his service contract, he continued to receive his salary and contractual benefits until the end of his notice period, being March 31, 2017, *i.e.*, the end of fiscal year 2017.

In January 2017 we published revised results for 2014/15 and 2015/16 as a result of our investigations into improper accounting practices in BT's Italian business. *The committee has recalculated the annual bonuses for the years in question and the outcome of the 2013 ISP award vesting to reflect the revised results. This showed that the payouts based on the revised results would have been lower than those actually paid at the time*.

The committee has therefore decided to exercise its discretion and apply the malus provisions in the Deferred Bonus Plan (DBP) to reduce the number of shares under award in recompense for payments and awards otherwise due under the annual bonus arrangements (for both cash and the deferred share element) and (where relevant) the ISP. These malus provisions will be applied in 2017/18 to previous awards made to the executive directors, plus the other Operating Committee members who received payments under the bonus arrangements and/or the ISP, and for the company secretary. This action ensures full restitution of the overpayments for the annual bonus (for the cash and the deferred share elements) and for the 2013 ISP award through the enforcement of the malus provisions in the DBP. This places the recipients in the same position they would otherwise have been in had the annual bonus and the ISP award been based on the revised results. The application of the malus provisions are calculated based on the share price at the original grant. For the cash element of the annual bonus, the calculation is based on the share price of the corresponding deferred share award.

The committee will keep under active review whether any additional employees' awards should be adjusted. In addition, where employees have been dismissed or resigned due to the outcome of our investigations into the issues in Italy, shares and incentives have lapsed in full as a result.

The table below sets out the number of shares under the relevant DBP awards following the application of malus as explained above and as agreed by the committee. These shares will normally be transferred to participants at the end of the three-year deferred period if those participants are still employed by BT. Simon Lowth joined on 12 July 2016 and did not receive a bonus in 2016/17 for the 2015/16 financial year.

| | Shares under award at 31 March 2017 | Shares lapsed following application of malus | Total number of award shares remaining | Value of shares lapsed following application of malus | Vesting date | Price at grant |
|---|---|---|---|---|---|---|
| **Gavin Patterson** | | | | | | |
| DBP 2014 | 138,952 | 7,243 | 131,709 | £27,828 | 01/08/17 | 384.20p |
| DBP 2015 | 105,028 | 15,867 | 89,161 | £71,327 | 01/08/18 | 449.53p |
| DBP 2016 | 90,964 | 59,339 | 31,625 | £239,243 | 01/08/19 | 403.18p |
| **Total** | **334,944** | **82,449** | **252,495** | **£338,398** | | |

| | Shares under award at 31 March 2017 | Shares lapsed following application of malus | Total number of award shares remaining | Value of shares lapsed following application of malus | Vesting date | Price at grant |
|---|---|---|---|---|---|---|
| **Former Director** | | | | | | |
| **Tony Chanmugam** | | | | | | |
| DBP 2014 | 147,828 | 3,367 | 144,461 | £12,936 | 01/08/17 | 384.20p |
| DBP 2015 | 56,739 | 9,214 | 47,525 | £41,420 | 01/08/18 | 449.53p |
| DBP 2016 | 50,537 | 34,490 | 16,047 | £139,057 | 01/08/19 | 403.18p |
| **Total** | **255,104** | **47,071** | **208,033** | **£193,412** | | |

## MATERIALLY FALSE AND MISLEADING STATEMENTS MADE BY DEFENDANTS DURING THE CLASS PERIOD

**Fiscal Year 2013 False and Misleading Statements and Omissions**

87.      The Class Period begins on May 10, 2013.  On that date, BT Group issued a press release announcing its financial results for the fourth quarter and year end 2013, the period ending March 31, 2013.  For the year, the Company reported revenue of £18,253 million, EBITDA of £6,181 million, operating profit of £3,338 million, profit before tax of £2,694 million, and adjusted earnings per share of 26.6p.   In the press release, BT Group's CEO, Defendant Livingston, commented on the results.

88.      In reaction to these announcements, the price of BT Group ADRs rose $2.52 per ADR on May 10, 2013, to $23.75 per ADR[13] – an increase of 12%.

89.      On May 23, 2013, the Company filed the 2013 Annual Report.  With regard to BT Group's "Internal control over financial reporting," the 2013 Annual Report stated, in pertinent part, as follows:

**Internal control over financial reporting**

BT's management is responsible for establishing and maintaining adequate internal control over financial reporting for the group including the consolidation process.

---

[13]   Share prices are adjusted for dividends.

Internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with IFRS [International Financial Reporting Standards].  Management conducted an assessment of the effectiveness of internal control over financial reporting based on the framework for internal control evaluation contained in the Revised Guidance for Directors on the UK Governance Code published by the Financial Reporting Council (the Turnbull Guidance).

Based on this assessment, management has concluded that at 31 March 2013, BT's internal control over financial reporting was effective.

There were no changes in BT's internal control over financial reporting that occurred during 2012/13 that have materially affected, or are reasonably likely to have materially affected, the group's internal control over financial reporting.  Any significant deficiency, as defined by the US Public Company Accounting Oversight Board (PCAOB), in internal control over financial reporting, is reported to the Audit & Risk Committee.  PricewaterhouseCoopers LLP, which has audited the consolidated financial statements for 2012/13, has also audited the effectiveness of the group's internal control over financial reporting under Auditing Standard No.5 of the PCAOB.

90.     The 2013 Annual Report included signed certifications by Defendants Livingston and Chanmugam, representing that the financial information contained therein was accurate and that the Company's internal and disclosure controls were effective.   Livingston's and Chanmugam's certifications stated, in pertinent part, as follows:

I, [Defendant Livingston and Chanmugam], certify that:

1.     I have reviewed this annual report on Form 20-F of BT Group plc;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.     The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act

Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

a)         Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)         Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)         Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)         Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5.        The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

a)         All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

b)         Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

91.      In the 2013 Annual Report, Rose, Chairman of the Audit Committee, noted that the

Audit Committee had given particular focus to BT's operations in Italy.  Rose stated, in pertinent

part, as follows:

**Internal controls and risk management**

We give risk management special attention and during the year we heard from each line of business CEO on the key risks in their part of the business, as well as the actions they are taking to address them.  We aim to cover all significant risks to the group not just the financial risks. . . .

***We received updates on*** security and resilience, cyber security, BT's networks, major contracts, ***BT's operations in Italy***, customer data handling, litigation trends, as well as updates on major litigation and competition and regulation.

92.     The statements referenced above in ¶¶87, 89-91 were materially false and misleading when made because they misrepresented and/or failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)     that the Company's Italian business had overstated revenue, operating profit, profit before tax, and earnings per share, and understated operating costs, for several years;

(b)     that the Company engaged in, and continued to engage in, improper accounting practices, which included a complex set of improper sales, purchase, factoring, and leasing transactions;

(c)     that the Company's financial statements, and other financial information included in the 2013 Annual Report, did not fairly present in all material respects the financial condition and results of operations of the Company as of, and for, the periods presented in the 2013 Annual Report;

(d)     that Livingston and Chanmugam failed to adequately design disclosure controls and procedures, or failed to cause such disclosure controls and procedures to be designed under their supervision, to ensure that material information regarding the Company was made known to them by others within the Company;

(e)     that Livingston and Chanmugam failed to adequately design internal controls over financial reporting, or failed to cause such internal controls over financial reporting

to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with International Financial Reporting Standards ("IFRS");[14]

(f)     that Livingston and Chanmugam failed to adequately evaluate the effectiveness of the Company's disclosure controls and procedures;

(g)     that Livingston and Chanmugam failed to disclose to the Company's auditors and the Audit Committee the fraudulent activity of BT Italy's senior management;

(h)     that Livingston and Chanmugam falsely presented in the 2013 Annual Report their conclusions about the effectiveness of the Company's disclosure controls and procedures;

(i)     that the 2013 Annual Report did not fully comply with the requirements of Section 13(a) or 15(d) of the Exchange Act;

(j)     that the Company's financial statements were not prepared in accordance with IFRS or the Company's own stated accounting policies, as detailed in ¶¶124-80; and

(k)     that the Company's internal controls were materially deficient, as detailed in ¶171.

**Fiscal Year 2014 False and Misleading Statements and Omissions**

93.     On July 25, 2013, BT Group issued a press release announcing its financial results for the fiscal first quarter of 2014, the period ending June 30, 2013.  For the quarter, the Company reported revenue of £4,449 million, EBITDA of £1,440 million, operating profit of £743 million,

---

[14]  IFRS and Generally Accepted Accounting Principles ("GAAP") are the two primary accounting frameworks used in the world today.  IFRS is the accounting standard used in more than 110 countries, whereas GAAP is used in the United States.

profit before tax of £595 million, and adjusted earnings per share of 5.9p.  In the press release, Livingston commented on the results.

94.     On October 31, 2013, BT Group issued a press release announcing its financial results for the fiscal second quarter of 2014, the period ending September 30, 2013.  For the quarter, the Company reported revenue of £4,491 million, EBITDA of £1,434 million, operating profit of £757 million, profit before tax of £609 million, and adjusted earnings per share of 6.0p. In the press release, Defendant Patterson, who became BT Group's CEO on September 10, 2013, commented on the results.

95.     On January 31, 2014, BT Group issued a press release announcing its financial results for the fiscal third quarter of 2014, the period ending December 31, 2013.  For the quarter, the Company reported revenue of £4,599 million, EBITDA of £1,537 million, operating profit of £867 million, profit before tax of £722 million, and adjusted earnings per share of 7.3p.  In the press release, Patterson commented on the results.

96.     On May 8, 2014, BT Group issued a press release announcing its financial results for the fiscal fourth quarter and year end 2014, the period ending March 31, 2014.  For the year, the Company reported revenue of £18,287 million, EBITDA of £6,116 million, operating profit of £3,421 million, profit before tax of £2,827 million and adjusted earnings per share of 28.2p.  In the press release, Patterson commented on the results.

97.     On May 22, 2014, the Company filed the 2014 Annual Report.  With regard to BT Group's "Internal control over financial reporting," the 2014 Annual Report stated, in pertinent part, as follows:

**Internal control over financial reporting**

BT's management is responsible for establishing and maintaining adequate internal control over financial reporting for the group.  Internal control over financial

- 34 -

reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with IFRS.  Management conducted an assessment of the effectiveness of internal control over financial reporting based on the framework for internal control evaluation contained in the Revised Guidance for Directors on the UK Governance Code published by the Financial Reporting Council (the Turnbull Guidance).

Based on this assessment, management has concluded that at 31 March 2014, BT's internal control over financial reporting was effective.

There were no changes in BT's internal control over financial reporting that occurred during 2013/14 that have materially affected, or are reasonably likely to have materially affected, the group's internal control over financial reporting.  Any significant deficiency, as defined by the US Public Company Accounting Oversight Board (PCAOB), in internal control over financial reporting, is reported to the Audit & Risk Committee.  PricewaterhouseCoopers LLP, which has audited the consolidated financial statements for 2013/14, has also audited the effectiveness of the group's internal control over financial reporting under Auditing Standard No.5 of the PCAOB.

98.    The 2014 Annual Report included signed certifications by Defendants Patterson and Chanmugam, similar to the certifications quoted in ¶90, representing that the financial information contained therein was accurate and that the Company's internal and disclosure controls were effective.

99.    In the 2014 Annual Report, Rose, Chairman of the Audit Committee, noted the special attention that the Audit Committee had paid to BT's operations in Italy.  Rose stated, in pertinent part, as follows:

> *This year the Audit & Risk Committee paid special attention to several overseas locations that are important to BT Global Services, including Italy* and Brazil, to data security and to the increasing cyber security threat.  We have received detailed presentations from key personnel in each of these areas and reviewed management's mitigation plans.
>
> *   *   *
>
> *I reported last year that the committee had given particular focus to BT's operations in Italy. We have continued to monitor the position there and significant progress has been made to improve the control environment*.

100.    The statements referenced above in ¶¶93-99 were materially false and misleading when made because they misrepresented and/or failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)     that the Company's Italian business had overstated revenue, operating profit, profit before tax, and earnings per share, and understated operating costs, for several years;

(b)     that the Company engaged in, and continued to engage in, improper accounting practices, which included a complex set of improper sales, purchase, factoring, and leasing transactions;

(c)     that the Company's financial statements, and other financial information included in the 2014 Annual Report, did not fairly present in all material respects the financial condition and results of operations of the Company as of, and for, the periods presented in the 2014 Annual Report;

(d)     that Patterson and Chanmugam failed to adequately design disclosure controls and procedures, or failed to cause such disclosure controls and procedures to be designed under their supervision, to ensure that material information regarding the Company was made known to them by others within the Company;

(e)     that Patterson and Chanmugam failed to adequately design internal controls over financial reporting, or failed to cause such internal controls over financial reporting to be designed under their supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with IFRS;

(f)     that Patterson and Chanmugam failed to adequately evaluate the effectiveness of the Company's disclosure controls and procedures;

(g)      that Patterson and Chanmugam failed to disclose to the Company's auditors and the Audit Committee the fraudulent activity of BT Italy's senior management;

(h)      that Patterson and Chanmugam falsely presented in the 2014 Annual Report their conclusions about the effectiveness of the Company's disclosure controls and procedures;

(i)      that the 2014 Annual Report did not fully comply with the requirements of Section 13(a) or 15(d) of the Exchange Act;

(j)      that the Company's financial statements were not prepared in accordance with IFRS or the Company's own stated accounting policies, as detailed in ¶¶124-80; and

(k)      that the Company's internal controls were materially deficient, as detailed in ¶171.

**Fiscal Year 2015 False and Misleading Statements and Omissions**

101.     On July 31, 2014, BT Group issued a press release announcing its financial results for the fiscal first quarter of 2015, the period ending June 30, 2014.  For the quarter, the Company reported revenue of £4,354 million, EBITDA of £1,435 million, operating profit of £783 million, profit before tax of £638 million, and adjusted earnings per share of 6.5p.  In the press release, Patterson commented on the results.

102.     On October 30, 2014, BT Group issued a press release announcing its financial results for the fiscal second quarter of 2015, the period ending September 30, 2014.  For the quarter, the Company reported revenue of £4,383 million, EBITDA of £1,450 million, operating profit of £832 million, profit before tax of £690 million, and adjusted earnings per share of 6.9p. In the press release, Patterson commented on the results.

103.     On January 30, 2015, BT Group issued a press release announcing its financial results for the fiscal third quarter of 2015, the period ending December 31, 2014.  For the quarter,

the Company reported revenue of £4,475 million, EBITDA of £1,567 million, operating profit of £949 million, profit before tax of £814 million, and adjusted earnings per share of 8.0p.  In the press release, Patterson commented on the results.

104.    On May 7, 2015, BT Group issued a press release announcing its financial results for the fiscal fourth quarter and year end 2015, the period ending March 31, 2015.  For the year, the Company reported revenue of £17,851 million, EBITDA of £6,271 million, operating profit of £3,733 million, profit before tax of £3,172 million, and adjusted earnings per share of 31.5p.  In the press release, Patterson commented on the results.

105.    On May 21, 2015, the Company filed the 2015 Annual Report.  With regard to BT Group's "Internal control over financial reporting," the annual report stated, in pertinent part, as follows:

**Internal control over financial reporting**

BT's management is responsible for establishing and maintaining adequate internal control over financial reporting for the group.  Internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with IFRS.  Management conducted an assessment of the effectiveness of internal control over financial reporting based on the framework for internal control evaluation contained in the Revised Guidance for Directors on the UK Governance Code published by the Financial Reporting Council (the Turnbull Guidance).

Based on this assessment, management has concluded that at 31 March 2015, BT's internal control over financial reporting was effective.

There were no changes in BT's internal control over financial reporting that occurred during 2014/15 that have materially affected, or are reasonably likely to have materially affected, the group's internal control over financial reporting.  Any significant deficiency, as defined by the US Public Company Accounting Oversight Board (PCAOB), in internal control over financial reporting, is reported to the Audit & Risk Committee.  PricewaterhouseCoopers LLP, which has audited the consolidated financial statements for 2014/15, has also audited the effectiveness of the group's internal control over financial reporting under Auditing Standard No. 5 of the PCAOB.

106.    The 2015 Annual Report included signed certifications by Defendants Patterson and Chanmugam, similar to the certifications quoted in ¶90, representing that the financial information contained therein was accurate and that the Company's internal and disclosure controls were effective.

107.    In the 2015 Annual Report, Rose again noted the particular focus that the Audit Committee had been giving to BT Italy.  Rose stated, in pertinent part, as follows:

> The committee has an annual work plan.  This includes standing items that we consider regularly, in addition to any specific matters that need the committee's attention and topical items on which we chose to focus.  ***For example, in 2014/15 we asked management to provide us with greater detail on the governance and control in relation to . . . operations in Italy***[.]
>
> *           *           *
>
> ***I reported last year that the committee had given particular focus to BT's operations in Italy*** and Brazil.  ***We have continued to monitor the position and significant progress has been made to improve the control environment***.  We continue to keep under review the current trends of security risks facing BT and the progress made to manage these risks.

108.    BT Group's Chairman, Michael Rake, stated that the Board's focus for fiscal year 2015 had been, among other things, "a visit to BT's business in Italy."  The Company further stated, in pertinent part, as follows: "We visited our Italy business, and while there we reviewed operational matters with senior managers, met with employees as well as customers, government officials and opinion leaders."

109.    The statements referenced above in ¶¶101-08 were materially false and misleading when made and/or failed to disclose material facts, which were known to Defendants or recklessly disregarded by them, for the reasons set forth in ¶100 above.

**Fiscal Year 2016 False and Misleading Statements and Omissions**

110.    On July 30, 2015, BT Group issued a press release announcing its financial results for the fiscal first quarter of 2016, the period ending June 30, 2015.  For the quarter, the Company reported revenue of £4,278 million, EBITDA of £1,449 million, operating profit of £821 million, profit before tax of £694 million, and adjusted earnings per share of 6.7p.  In the press release, Patterson commented on the results.

111.    On October 29, 2015, BT Group issued a press release announcing its financial results for the fiscal second quarter of 2016, the period ending September 30, 2015.  For the quarter, the Company reported revenue of £4,381 million, EBITDA of £1,442 million, operating profit of £819 million, profit before tax of £706 million, and adjusted earnings per share of 6.9p. In the press release, Patterson commented on the results.

112.    On February 1, 2016, BT Group issued a press release announcing its financial results for the fiscal third quarter of 2016, the period ending December 31, 2015.  For the quarter, the Company reported revenue of £4,594 million, EBITDA of £1,613 million, operating profit of £1,021 million, profit before tax of £928 million, and adjusted earnings per share of 9.0p.  In the press release, Patterson commented on the results.

113.    On May 5, 2016, BT Group issued a press release announcing its financial results for the fiscal fourth quarter and year end 2016, the period ending March 31, 2016.  For the year, the Company reported revenue of £18,909 million, EBITDA of £6,580 million, operating profit of £3,950 million, profit before tax of £3,473 million, and adjusted earnings per share of 33.2p.  In the press release, Patterson commented on the results.

114.    On May 19, 2016, the Company filed the 2016 Annual Report.  With regard to BT

Group's "Internal control over financial reporting," the 2016 Annual Report stated, in pertinent

part, as follows:

**Internal control over financial reporting**

BT's management is responsible for establishing and maintaining adequate internal
control over financial reporting for the group.  Internal control over financial
reporting is designed to provide reasonable assurance regarding the reliability of
financial reporting and the preparation of financial statements for external reporting
purposes in accordance with IFRS.  Management conducted an assessment of the
effectiveness of internal control over financial reporting based on the framework
for internal control evaluation contained in the FRC Guidance on internal control
(Turnbull), which is now reflected in the FRC Guidance on risk management,
internal control and related financial and business reporting.

The scope of management's assessment of the effectiveness of our internal control
over financial reporting included all relevant operations, except for the operation of
the subsidiary EE Limited, which we acquired in January 2016.  This exclusion is
in accordance with the SEC's general guidance that an assessment of a recently
acquired business may be omitted from our scope in the year of acquisition.  EE
Limited constituted 37% of total assets and 5% of the external revenue of the
consolidated financial statements of the group for the year ended 31 March 2016.

Management has concluded that at 31 March 2016, BT's internal control over
financial reporting was effective.

There were no other changes in BT's internal control over financial reporting that
occurred during 2015/16 that have materially affected, or are reasonably likely to
have materially affected, the group's internal control over financial reporting.  Any
significant deficiency, as defined by the US Public Company Accounting Oversight
Board (PCAOB), in internal control over financial reporting, is reported to the
Audit & Risk Committee.

PricewaterhouseCoopers, which has audited the consolidated financial statements
for 2015/16, has also audited the effectiveness of the group's internal control over
financial reporting under Auditing Standard No. 5 of the PCAOB.

115.    The 2016 Annual Report included signed certifications by Defendants Patterson

and Chanmugam, similar to the certifications quoted in ¶90, representing that the financial

information contained therein was accurate and that the Company's internal and disclosure

controls were effective.

116.    In the 2016 Annual Report, the Company again indicated that the control environment at its Italian operations suffered from unspecified problems.  Rose stated, in pertinent part, as follows: "We have continued to monitor our operations in Italy and progress has been made to improve the control environment.  We continue to keep under review the current trends of security risks facing BT and the progress made to manage these risks."

117.    The statements referenced above in ¶¶110-16 were materially false and misleading when made and/or failed to disclose material facts, which were known to Defendants or recklessly disregarded by them, for the reasons set forth in ¶100 above.

**Fiscal Year 2017 False and Misleading Statements and Omissions**

118.    On July 28, 2016, BT Group issued a press release announcing its financial results for the fiscal first quarter of 2017, the period ending June 30, 2016.  For the quarter, the Company reported revenue of £5,775 million, EBITDA of £1,818 million, operating profit of £963 million, profit before tax of £802 million, and adjusted earnings per share of 6.6p.  In the press release, Patterson commented on the results.

119.    The statements referenced above in ¶118 were materially false and misleading when made because they misrepresented and/or failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)    that the Company's Italian business was overstating revenue, operating profit, profit before tax, and earnings per share, and understating operating costs, over a number of years;

(b)    that the Company was engaging in improper accounting practices, which included a complex set of improper sales, purchase, factoring, and leasing transactions; and

(c)      that the Company's internal controls were materially deficient, as detailed in ¶171.

## THE TRUTH IS DISCLOSED

120.    As detailed above in ¶¶49-59, the truth about Defendants' fraud was disclosed on October 27, 2016 and January 24, 2017.  In reaction to these corrective disclosures, BT Group's stock price declined by 2.4% and 20.7%, respectively, on extremely heavy trading volume.

121.    The market for BT Group ADRs was open, well-developed and efficient at all relevant times.  As a result of the materially false and misleading statements and omissions alleged herein, BT Group ADRs traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Class purchased or otherwise acquired BT Group ADRs relying upon the integrity of the market price of BT Group ADRs and market information relating to BT Group, and have been damaged thereby.

122.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of BT Group ADRs, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

123.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about BT Group's financial performance and operations.  These material misstatements

and omissions had the cause and effect of creating in the market an unrealistically positive assessment of BT Group ADRs and its business, thus causing the Company's shares to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's ADRs at artificially inflated prices, thus causing the damages complained of herein.

### BT GROUP'S FINANCIAL REPORTING DURING THE CLASS PERIOD WAS MATERIALLY FALSE AND MISLEADING AND VIOLATED IFRS

124.    Compliance with applicable accounting standards is a basic fundamental obligation of publicly traded companies.  As set forth in Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [IFRS] will be presumed to be misleading or inaccurate . . . ."  17 C.F.R. §210.4-01(a).

125.    As detailed herein, BT Group has now admitted that the financial statements it issued to investors and filed with the SEC during the Class Period were materially misstated and presented in violation of IFRS.  Accordingly, the financial statements BT Group issued to investors and filed with the SEC during the Class Period are presumed to be misleading and inaccurate pursuant to the SEC's Regulation S-X.

126.    Specifically, BT Group has now admitted that the financial statements it issued to investors and filed with the SEC on Forms 20-F for the years ended March 31, 2015 and 2016 were materially misstated.  In addition, while BT Group has not corrected its financial statements for the periods prior to the year ended March 31, 2015, it has admitted that the Company's net income prior to April 1, 2014 was overstated by a total of £64 million.

127.    The corrections made by the Company to its previously issued financial statements establish that BT Group itself has concluded that the financial statements it issued to investors and

filed with the SEC during the Class Period were materially misstated because the provisions of IFRS associated with corrections of misstatements in prior-period financial statements  need not be made when the effect of applying them is immaterial.  *See, e.g.*, International Accounting Standard ("IAS") 8, *Accounting Policies, Changes in Accounting Estimates and Errors*.

128.    BT Group has also acknowledged that its multi-year financial misstatements resulted from long-standing, fraudulent conduct perpetrated by ***the most senior-level managers*** of its Italian operations.  These misstatements included both the overstatement of reported revenue and the understatement of reported expenses.

129.    Thus, in light of their admissions, there can be no dispute that Defendants made materially misleading financial representations about the Company's operations, and that BT Group issued materially false and misleading financial statements and financial disclosures to investors during the Class Period.

130.    In addition, BT Group has now admitted that, despite repeated representations to the contrary during the Class Period, it did not maintain an effective system of internal control over financial reporting.  A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement in an entity's financial statements will not be prevented or detected on a timely basis.

131.    As set forth in Section 13 of the Exchange Act, Defendants were responsible for presenting BT Group's business activities in a manner that accurately and fairly reflected its transactions, and maintaining a system of internal accounting controls sufficient to provide reasonable assurances that BT Group's financial statements conformed to IFRS:

> Every issuer which has a class of securities registered pursuant to section 12 of this title and every issuer which is required to file reports pursuant to section 15(d) of this title shall –

- 45 -

A.     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; [and]

B.     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

i.     transactions are executed in accordance with management's general or specific authorization;

ii.     transactions are recorded as necessary (I) to permit preparation of financial statements in conformity with [IFRS] or any other criteria applicable to such statements, and (II) to maintain accountability for assets;

iii.     access to assets is permitted only in accordance with management's general or specific authorization; and

iv.     the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

**BT Group Admitted the Financial Statements It Issued During the Class Period Were Presented in Violation of Applicable Accounting Standards**

132.     Throughout the Class Period, BT Group's Forms 20-F, signed by Defendant Chanmugam, falsely and misleadingly represented that the Company's financial reporting was presented in accordance with IFRS, stating, in pertinent part, and in all material respects, as follows:

These consolidated financial statements have been prepared in accordance with the Companies Act 2006, Article 4 of the IAS Regulation and International Accounting Standards (IAS) and International Financial Reporting Standards (IFRS) and related interpretations, as adopted by the European Union.  The consolidated financial statements are also in compliance with IFRS as issued by the International Accounting Standards Board (the IASB).  The consolidated financial statements are prepared on a going concern basis.

133.     BT Group has now admitted that the foregoing were untrue statements of material fact when made, stating, in pertinent part, as follows:

[O]ur investigations into our Italian business have revealed inappropriate behaviour and improper accounting practices.  The improper practices included a complex set of improper sales, purchase, factoring and leasing transactions.

- 46 -

\*       \*       \*

The prior years' errors have resulted from profits, and therefore equity, being overstated for a number of years.  These errors affected the Consolidated Group Balance Sheets and Consolidated Group Income Statements included in the Annual Report and Form 20-F for a number of years including the years ended 31 March 2016 and 31 March 2015, and in each of the quarterly results announcements of those years.

134.     The details of the Company's admissions associated with its financial improprieties during the Class Period are, for the most part, set forth in the 2017 Annual Report.

135.     As noted in the 2017 Annual Report, the results of an investigation initiated by BT Group found "inappropriate behaviour in our Italian business," including the "collusion, circumvention and override of controls" that resulted in "improper sales, purchase, factoring and leasing transactions in our Italian business."

136.     Prior to the issuance of the 2017 Annual Report, on October 27, 2016, BT Group announced that the preliminary findings of its internal investigation into the accounting practices of its Italian business had identified certain historical accounting errors requiring the write down of balance sheet items totaling £145 million.

137.     Later, on January 24, 2017, BT Group issued a press release announcing, among other things, that: (i) the adjustments necessary to correct its prior financial reporting had ballooned to £530 million, an amount nearly four times greater than it had previously represented; (ii) the breadth of the Italian scandal was "far greater than previously identified"; and (iii) the adverse financial ramifications ensuing therefrom would last through *2018*.  BT Group stated, in pertinent part, as follows:

> [T]he extent and complexity of inappropriate behaviour in the Italian business were far greater than previously identified and have revealed improper accounting practices and a complex set of improper sales, purchase, factoring and leasing transactions.  These activities have resulted in the overstatement of earnings in our Italian business over a number of years.

- 47 -

*     *     *

*The adjustments identified have increased* from the £145m announced in our half-year update *to a total of around £530m*.

*     *     *

In addition, we would expect the matters described above to result in a reduction in our Q3 adjusted revenue and adjusted EBITDA of around £120m, and in a reduction in Q3 normalised free cash flow of around £100m.  *For 2016/17 as a whole, relative to our prior outlook, we would expect a decrease in adjusted revenue of around £200m, in adjusted EBITDA of around £175m, and of up to £500m of normalised free cash flow due to the EBITDA impact and the one-off unwind of the effects of inappropriate working capital transactions.  For 2017/18, we would expect a similar annual impact to adjusted revenue and adjusted EBITDA as in 2016/17,* with the EBITDA impact flowing through to normalised free cash flow.

*     *     *

*The improper behaviour in our Italian business is an extremely serious matter*, and *we have taken immediate steps to strengthen the financial processes and controls in that business.  We suspended a number of BT Italy's senior management team who have now left the business*.  We have also appointed a new Chief Executive of BT Italy who will take charge on 1 February 2017.

**Admissions About BT Group's Improper Accounting for, and Reporting of, Revenue**

138.    IFRS, specifically IAS 18, *Revenue*, provides that revenue is to be recognized when it is probable that future economic benefits will flow to the entity and those benefits can be measured reliably.  In addition, IFRS in IAS 11, *Construction Contracts*, requires that when the outcome of a construction contract can be estimated reliably, contract revenue and contract costs associated with the construction contract is to be recognized as revenue and expenses, respectively, by reference to the stage of completion of the contract activity at the end of the reporting period. When the outcome of a construction contract cannot be estimated reliably, revenue shall be recognized only to the extent the recoverability of contract costs incurred is probable and contract costs are to be recognized as an expense in the period in which they are incurred.  When it is

probable that total contract costs will exceed the total contract revenue, the expected loss is recognized as an expense immediately.

139.    In BT Group's annual financial statements included in the Company's Forms 20-F filed with the SEC during the Class Period, Defendants falsely and misleadingly represented that BT Group's revenues were accounted for and reported in its financial statements in a manner consistent with the requirements of IFRS, stating, in pertinent part, and in all material respects, as follows:

**Revenue**

Revenue represents the fair value of the consideration received or receivable for communications services and equipment sales, net of discounts and sales taxes. Revenue is recognised when it is probable that the economic benefits associated with a transaction will flow to the group and the amount of revenue and associated costs can be measured reliably.  The accounting for revenue sharing arrangements depends on the analysis of the facts and circumstances surrounding these transactions.

Where we act as an agent in a transaction, we recognise revenue net of directly attributable costs.

**Services**

Revenue arising from separable installation and connection services is recognised when it is earned, upon activation.  Revenue from the rental of analogue and digital lines and private circuits is recognised on a straight line basis over the period to which it relates.  Revenue from calls is recognised at the time the call is made over our network. Subscription fees, consisting primarily of monthly charges for access to broadband and other internet access or voice services, are recognised as revenue as the service is provided. Revenue from the interconnection of voice and data traffic between other telecommunications operators is recognised at the time of transit across our network.

Revenues from telephone service and internet access subscription fees as well as those from wholesale access revenues are recognised on a straight line basis over the period to which they relate. Revenue from calls is recognised at the time the call is made over the group's network.  Revenue from the interconnection of voice and data traffic between other telecommunications operators is recognised at the time of transit across the group's network.

**Equipment sales**

Revenue from the sale of equipment is recognised when all the significant risks and rewards of ownership are transferred to the customer, which is normally the date the equipment is delivered and accepted by the customer.

**Long-term contractual arrangements**

Revenue from long-term contractual arrangements, including fixed price contracts to design and build software solutions, is recognised based on the percentage of completion method.  The stage of completion is estimated using an appropriate measure according to the nature of the contract such as the proportion of costs incurred relative to the estimated total contract costs, or other measures of completion such as the achievement of contract milestones and customer acceptance.  In the case of time and materials contracts, revenue is recognised as the service is rendered.

Costs related to delivering services under long-term contractual arrangements are expensed as incurred except for an element of costs incurred in the initial contract set-up, transition or transformation phase, which is deferred and recorded within noncurrent assets.  These costs are then recognised in the income statement on a straight line basis over the remaining contract term, unless the pattern of service delivery indicates a different profile is more appropriate.  These costs are directly attributable to specific contracts, relate to future activity, will generate future economic benefits and are assessed for recoverability on a regular basis.

The percentage of completion method relies on estimates of total expected contract revenues and costs, as well as reliable measurement of the progress made towards completion.  Unless the financial outcome of a contract can be estimated with reasonable certainty, no attributable profit is recognised.  In such circumstances, revenue is recognised equal to the costs incurred to date, to the extent that such revenue is expected to be recoverable, or costs are accrued to bring the margin to nil.  Recognised revenue and profits are subject to revisions during the contract if the assumptions regarding the overall contract outcome are changed.  The cumulative impact of a revision in estimates is recorded in the period in which such revisions become likely and can be estimated.  Where the actual and estimated costs to completion exceed the estimated revenue for a contract, the full contract life loss is recognised immediately

140.     These representations were materially false and misleading when made because, as

the Company has now admitted, BT Group recorded "improper sales," which caused the financial

statements and the related financial representations issued by Defendants during the Class Period

to be materially misstated.  These improperly recorded sales totaled £22 million, £30 million, and £11 million during the years ended March 31, 2017, 2016 and 2015, respectively.

141.    Concerning these improper sales transactions, on April 21, 2017, *Reuters* published an article announcing that it had seen a criminal complaint filed by BT Group with Italian prosecutors accusing former Company executives in Italy of unlawful conduct.  According to the article, "[t]he *Reuters* investigation found that a network of people in BT Italy had exaggerated revenues, faked contract renewals and invoices and invented bogus supplier transactions in order to meet bonus targets and disguise the unit's true financial performance," and that such practices had been occurring since "at least 2013."

142.    According to *Reuters*, the complaint alleges that the former BT Italy CEO, Cimini, engaged in "grave violations of corporate governance rules in relation to contracts and suppliers," and the former BT Italy COO, Truzzoli, "manipulated [Company] results."

143.    These fraudulent activities, perpetrated by the most senior executives of BT Group's Italian operations, caused, as BT Group has now admitted, the Company's financial statements and financial disclosures issued by Defendants during the Class Period to be materially false and misleading.

**Admissions About BT Group's Accounting for, and Reporting of, Receivables, Payables, and Leasing Transactions**

144.    In addition to fraudulently inflating reported revenue, BT Group manipulated its financial results during the Class Period by improperly accounting for receivables, payables, and leasing transactions, which falsely and misleadingly understated reported expenses.

145.    IFRS, specifically IAS 39, *Financial Instruments; Recognition and Measurement* provides that receivables and payables are to be recognized in financial statements when an entity becomes a party to a financial instrument contract.  Generally, a company is required to remove

financial liabilities from its balance sheet when its obligation is extinguished, and remove financial assets from its balance sheet when, among other things, its contractual rights to the asset's cash flows expire.

146.    In addition, IFRS in IAS 17, *Leases*, provides that if a sale and leaseback transaction results in a finance lease, any excess of sales proceeds over the carrying amount shall not be immediately recognized as income by a seller-lessee and should be deferred and amortized over the lease term.  If a sale and leaseback transaction results in an operating lease, and it is clear that the transaction has an established fair value, any profit or loss shall be recognized immediately.

147.    In BT Group's annual financial statements included in the Company's Forms 20-F filed with the SEC during the Class Period, Defendants falsely and misleadingly represented that BT Group's receivables, payables, and leasing transactions were accounted for and reported in its financial statements in a manner consistent with the requirements of IFRS, stating, in pertinent part, and in all material respects, as follows:

**Trade and other receivables**

Trade and other receivables are initially recognised at fair value, which is usually the original invoiced amount, and are subsequently carried at amortised cost, using the effective interest method, less provisions made for doubtful receivables. Provisions are made specifically where there is evidence of a risk of non-payment, taking into account ageing, previous losses experienced and general economic conditions.

*        *        *

**Trade and other payables**

Financial liabilities within trade and other payables are initially recognised at fair value, which is usually the original invoiced amount, and subsequently carried at amortised cost using the effective interest method.

**Loans and other borrowings**

Loans and other borrowings are initially recognised at the fair value of amounts received net of transaction costs.  Loans and other borrowings are subsequently

measured at amortised cost using the effective interest method and, if included in a fair value hedge relationship, are re-valued to reflect the fair value movements on the hedged risk associated with the loans and other borrowings.  The resulting amortisation of fair value movements, on de-designation of the hedge, is recognised in the income statement.

\*       \*       \*

**Leases**

The determination of whether an arrangement is, or contains, a lease is based on the substance of the arrangement and requires an assessment of whether the fulfilment of the arrangement is dependent on the use of a specific asset or assets and whether the arrangement conveys the right to use the asset.

Leases of property, plant and equipment where the group holds substantially all the risks and rewards of ownership are classified as finance leases.  Finance lease assets are capitalised at the commencement of the lease term at the lower of the present value of the minimum lease payments or the fair value of the leased asset. The obligations relating to finance leases, net of finance charges in respect of future periods, are recognised as liabilities.   Leases are subsequently measured at amortised cost using the effective interest method.

Leases where a significant portion of the risks and rewards are held by the lessor are classified as operating leases.  Rentals are charged to the income statement on a straight line basis over the period of the lease.

148.    These representations were materially false and misleading when made because, as the Company has now admitted, the financial statements and the related financial representations BT Group issued during the Class Period were materially misstated, in part, due to the reporting of "improper" purchase, factoring, and leasing transactions, well as trade and other receivables and various liabilities, including sales taxes.  These improperly recorded transactions had the effect of understating BT Group's operating costs by £238 million, £92 million, and £67 million during the years ended March 31, 2017, 2016 and 2015, respectively.

149.    Concerning these improper transactions, on July 1, 2017, the *Financial Times* published an article stating that the Guardia di Finanza, an Italian law enforcement agency primarily responsible for dealing with financial crimes and drug smuggling, was scrutinizing the

propriety of a 2015 sales leaseback transaction between BT Italy, ITF, and a unit of IBM. According to the *Financial Times*, citing a person with "direct knowledge" of Guardia di Finanza's investigation, BT Italy sold equipment to ITF for about €32 million and then leased the equipment back for about €36 million.  According to the *Financial Times*, BT Group has not been able to locate serial numbers for all of the equipment, leading Italian prosecutors to probe whether the entire transaction may have been fake.

150.    In addition, on January 24, 2017, *Reuters* published an article stating that prosecutors in Milan opened an investigation into "false accounting and embezzlement" within the Italian unit of BT Group.

151.    Further, on March 30, 2017, *Reuters* reported that three different employees of BT Group's Italian unit warned their Madrid-based supervisor in November 2015 about possible accounting problems at BT Italy, nearly one year before the Company first mentioned financial irregularities at the division.

152.    These fraudulent activities, perpetrated by the most senior executives of BT Group's Italian operations, caused the Company's financial statements and financial disclosures issued by Defendants during the Class Period to be materially false and misleading.

**BT Group's Financial Misrepresentations Were Material**

153.    As noted herein, BT Group has now retroactively corrected the misstatements contained in the financial statements that it issued to investors and filed with the SEC during the Class Period.  In doing so, BT Group determined that the financial statements it issued to investors during the Class Period were materially misstated, because pursuant to IFRS, only material prior period misstatements are to be corrected on a retroactive basis.  *See, e.g.*, IAS 8, *Accounting Policies, Changes in Accounting Estimates and Errors*.

154.   The quantitative impact of BT Group's financial misrepresentations caused its pre-tax income to be overstated by 4.2% and 3.0% during the years ended March 31, 2016 and March 31, 2015, respectively; its net income to be overstated by 5.0% and 3.8% during the years ended March 31, 2016 and March 31, 2015, respectively, and its total comprehensive income to be overstated by 4.6% and 5.3% during the years ended March 31, 2016 and March 31, 2015, respectively.

155.   During 2017, the quantitative impact associated with BT Group's financial malfeasance resulted in a £260 million charge against earnings.  But for this £260 million charge against earnings, BT Group's pre-tax income during the year ended March 31, 2017 would have been **11.1%** greater.[15]

156.   The quantitative impact of the Company's financial improprieties on BT Group's Global Services segment was more even significant, causing the operating profit in that line of business to be overstated by 214.0% and 371.4% during the years ended March 31, 2016 and March 31, 2015, respectively.  During the year ended March 31, 2017, the operating income of BT Group's Global Services segment would have been 438.0% greater absent the Company's financial improprieties detailed herein.

157.   The SEC, in its Staff Accounting Bulletin No. 99 ("SAB No. 99"), provides that materiality in the context of financial information not only includes an assessment of the magnitude of the misstatement in percentage terms, but also requires an assessment of the factual

---

[15]   Plaintiffs are unable to assess the quantitative impact ensuing from the Company's financial malfeasance on its 2017 income-tax expense.  Accordingly, Plaintiffs have presented the percentage impact of the Company's £260 million charge on its 2017 pre-tax income, rather than on its net, or after-tax, income.

context in which the user of financial statements would view the financial information (referred to in accounting and auditing literature as "quantitative" and "qualitative" factors).

158.    Thus, SAB No. 99 notes, in pertinent part, that:

[M]agnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment.  [Footnotes omitted.]

159.    Accordingly, SAB No. 99 states: "the staff believes that there are numerous circumstances in which [financial] misstatements below 5% could well be material.  Qualitative factors may cause [financial] misstatements of quantitatively small amounts to be material."

160.    Consistent with this analysis, IFRS, in IAS 8, *Accounting Policies, Changes in Accounting Estimates and Errors*, notes that materiality depends on the size and/or **nature** of an omission or misstatement.

161.    Pursuant to SAB No. 99, among the considerations that may well render a quantitatively small misstatement of a financial statement item material, include:

(a)    **whether the misstatement has the effect of increasing management's compensation** – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation;

(b)    **whether the misstatements were "part of an ongoing effort directed by or known to senior management for the purposes of 'managing' earnings"**;

(c)    whether the misstatement involves **concealment of an unlawful transaction**; and

(d)    whether the misstatement concerns an important segment or portion of an entity's business.

162.    In addition, on September 14, 2017, the International Accounting Standards Board ("IASB"), which promulgates IFRS, issued Practice Statement 2, *Making Materiality Judgements*, to provide guidance when making judgments about materially.  According to IASB, ***intentional misstatements shall always be considered material***.

163.    Consistent with this view, the SEC, in SAB No. 99 notes, in pertinent part, that:

> [T]he staff believes that ***a registrant*** and the auditors of its financial statements ***should not assume that even small intentional misstatements in financial statements***, for example those pursuant to actions to "manage" earnings, ***are immaterial***.

164.    Here, each of the aforementioned qualitative material factors contributed to the materiality of the financial misstatements made by Defendants during the Class Period.  As detailed herein, the executives of BT Group's Italian operations intentionally directed the recording of unlawful transactions during the Class Period to, in part, increase management's compensation and inflate the operating performance of both the Company and its Global Services segment.

165.    Additionally, SAB No. 99 provides that the "volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material."  When BT Global disclosed the financial impact associated with its financial improprieties to the market, the price of its common stock declined by 21% on January 24, 2017, wiping out £8 billion of its market capitalization.

166.    Moreover, PwC, BT Group's outside auditor during the Class Period, determined its own standard of materiality for the Company's financial statements as a whole.  In the 2017 Annual Report, PwC stated that the threshold for overall group materiality was £130 million.  BT Group's £530 million in adjustments due to the fraud in the Italian operations clears that threshold easily.

**BT Group Admits Its Internal and Disclosure Controls Were Ineffective and that Defendants' Certifications Were Materially False and Misleading**

167.    Internal control over financial reporting is broadly defined as a process, effected by an entity's board of directors, management and other personnel, designed to provide reasonable assurance that, among other things, the entity's financial reporting is reliable and accurate.

168.    Throughout the Class Period, BT Group's Annual Reports filed with the SEC on Form 20-F, signed by Chanmugam, repeatedly represented that BT Group's management was responsible for establishing and maintaining adequate internal control over the Company's financial reporting, stating, in pertinent part and in all material respects, as follows:

> BT's management is responsible for establishing and maintaining adequate internal control over financial reporting for the group. Internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external reporting purposes in accordance with IFRS.

169.    Item 15 of Form 20-F required that BT Group provide the information required by Regulation S-K Item 308, *Internal Control Over Financial Reporting* [17 C.F.R. 229.308], including, among other things, the assessment made by management concerning the effectiveness of the Company's internal control over financial reporting.

170.    Throughout the Class Period, Defendants falsely and misleadingly represented in the Annual Reports that BT Group filed with the SEC on Form 20-F that its internal controls were operating effectively when, as the Company has now admitted, they were not.  Defendants stated, in pertinent part, and in all material respects, as follows:

> ***Management conducted an assessment of the effectiveness of internal control over financial reporting*** based on the framework for internal control evaluation contained in the FRC Guidance on internal control (Turnbull), which is now reflected in the FRC Guidance on risk management, internal control and related financial and business reporting.

*        *        *

> *Management has concluded that at 31 March [2015 and 2016], BT's internal control over financial reporting was effective.*

171.    BT Group has now admitted that the foregoing statements were false and misleading statements of material fact when made, stating, in pertinent part, as follows:[16]

> [M]anagement has concluded that *our internal control over financial reporting was not effective as of 31 March 2017 due to the material weakness described below*.
>
> **Material Weakness in Internal Control over Financial Reporting**
>
> A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our consolidated financial statements will not be prevented or detected on a timely basis.
>
> Our Italian business is managed by a local management team within the Global Services line of business. *Individuals in Italy colluded to override the period end financial close controls and overstate the results, and the monitoring controls which include the review of reconciliations, journals, results and financial position, did not operate effectively to identify the overstatement in a timely manner.*
>
> The group did not maintain effective controls to prevent or detect the collusive circumvention or override of controls related to our Italian business. *Specifically management has identified the following internal control deficiencies related to our Italian business* and the failure to detect the circumvention or override of controls that together constitute a material weakness in the control environment (i) failure in the review of reconciliations (ii) failure in the review of journals and (iii) failure in our monitoring controls over the results and financial position of our Italian business.
>
> *This material weakness could result in a misstatement of the account balances and disclosures relating to our Italian business that would represent material misstatements in our annual consolidated financial statements that would not be prevented or detected.*

---

[16]  Throughout the Class Period, BT Group represented that there were no changes in the Company's internal controls over financial reporting.  Thus, it is reasonable to infer that BT Group's internal controls over financial reporting were ineffective throughout the Class Period.

172.     Indeed, throughout the Class Period, Defendants *knew* that the control environment associated with the Company's business in Italy was such that it required "special attention."  For example, in the 2014 Annual Report, BT Group disclosed, in pertinent part, as follows:[17]

> This year *the Audit & Risk Committee paid special attention to* several overseas locations that are important to BT Global Services, including *Italy* and Brazil . . . .
>
> \*          \*          \*
>
> *I reported last year that the [Audit] committee had given particular focus to BT's operations in Italy*.   We have continued to monitor the position there and *significant progress has been made to improve the control environment*.

173.     In the 2015 Annual Report, BT Group disclosed, in pertinent part, as follows:

> *We visited our Italy business, and while there we reviewed operational matters with senior managers, met with employees as well as customers*, government officials and opinion leaders.
>
> \*          \*          \*
>
> I reported last year that *the [Audit] committee had given particular focus to BT's operations in Italy* and Brazil.  *We have continued to monitor the position and significant progress has been made to improve the control environment*.

174.     Similarly, in the 2016 Annual Report, BT Group disclosed, in pertinent part, as follows: "We have continued to monitor our operations in Italy and progress has been made to improve the control environment."

175.     Disclosure controls and procedures are designed to ensure that information required to be disclosed by SEC registrants pursuant to SEC rules and regulations is appropriately recorded, processed, summarized and reported.

---

[17]     According to the  Committee of Sponsoring Organizations of the Treadway Commission ("COSO"), the control environment is the set of standards, processes, and structures that provide the basis for carrying out internal control across an organization.

176.    Item 15 of Form 20-F required BT Group to provide the information required by Regulation S-K Item 307 of Regulation S-K, *Disclosure Controls and Procedures* [17 C.F.R. 229.307], including, among other things, the conclusions of its principal executive and financial officers regarding the effectiveness of the Company's disclosure controls and procedures.

177.    Throughout the Class Period, Defendants falsely and misleadingly represented in Annual Reports that BT Group filed with the SEC on Form 20-F that its disclosure controls were operating effectively when, as the Company has now admitted, they were not, stating, in pertinent part, and in all material respects, as follows:

> The Chief Executive and Group Finance Director, after evaluating the effectiveness of BT's disclosure controls and procedures as of the end of the period covered by this Annual Report & Form 20-F, have concluded that, as of that date, BT's disclosure controls and procedures were effective to ensure that material information relating to BT was made known to them by others within the group.

> The Chief Executive and Group Finance Director concluded that BT's disclosure controls and procedures are also effective to ensure that the information the company is required to disclose in reports that it files under the Securities Exchange Act of 1934 (Exchange Act) is recorded, processed, summarised and reported within the time periods specified in the SEC's rules and forms.

178.    The above-noted false and misleading representations set forth in BT Group's Annual Reports filed with the SEC on Form 20-F concerning its internal controls over financial reporting and its disclosure controls were falsely and misleadingly certified by Defendants Livingston, Patterson, and Chanmugam:

> I, [Livingston/Patterson and Chanmugam], certify that:

> 1.    I have reviewed this annual report on Form 20-F of BT Group plc;

> 2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the

- 61 -

financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

4.      The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the company and have:

        a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

        b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

        c)      Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

        d)      Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

5.      The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's board of directors (or persons performing the equivalent functions):

        a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

        b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

179.   BT Group has now admitted that the foregoing statements were false and misleading statements of material fact when made, stating in the 2017 Annual Report, in pertinent part, as follows:

> We have evaluated the effectiveness of our disclosure controls and procedures. Based upon that evaluation, ***our chief executive and group finance director concluded that as a result of the material weakness described below*** [*see* ¶171], as of 31 March 2017, our disclosure controls and procedures were not effective to provide reasonable assurance that information required to be disclosed by us in the reports that we file or furnish under the Exchange Act is recorded, processed, summarised and reported, within the time periods specified in the applicable rules and forms.

180.   In the 2017 Annual Report, Defendants further disclosed that BT Group has taken certain actions to help remediate the material deficiencies noted above, stating, in pertinent part, as follows:

- We suspended a number of BT Italy's senior management team (who have now left the business).  The president of our European operations has also left the business.  We have appointed a new president of our European operations and a new CEO and CFO of BT Italy from outside the Italian executive management team;

- We strengthened our monitoring controls and escalation mechanisms as they relate to our Italian business, including in relation to the reviews of reconciliations and journals;

- We transferred the Italy customer billing activities to our group billing services function;

- We also are in the process of evaluating additional actions to remediate the material weakness and strengthen our internal control, governance and compliance environment, including increasing the resources and improving the capabilities of the controlling function and the audit function outside the UK, and further developing our integrated risk and assurance reporting processes; [and]

- We are also enhancing our controls and compliance programme to reinforce the importance of doing business in an ethical, disciplined and standardised way.

## ADDITIONAL SCIENTER ALLEGATIONS

181.   As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were

materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding BT Group, their control over, and/or receipt and/or modification of BT Group's allegedly materially misleading misstatements, and/or their associations with the Company which made them privy to confidential proprietary information concerning BT Group, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION

182.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of BT Group ADRs and operated as a fraud or deceit on purchasers of BT Group ADRs during the Class Period by failing to disclose and misrepresenting the adverse facts detailed herein.  As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of BT Group ADRs declined significantly as the prior artificial inflation came out of the Company's ADRs.

183.    As a result of their purchases of BT Group ADRs during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused BT Group ADRs to trade at artificially inflated levels throughout the Class Period, reaching as high as $37.49 per ADR on November 19, 2015.

184.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of BT Group's business, products, and operations.  When the truth

about the Company was revealed to the market, the price of BT Group ADRs fell significantly. These declines removed the inflation from the price of BT Group ADRs, causing real economic loss to investors who had purchased BT Group ADRs during the Class Period.

185.   The declines in the price of BT Group ADRs after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in BT Group ADRs negates any inference that the losses suffered by Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

186.   The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of BT Group ADRs and the subsequent significant decline in the value of BT Group ADRs when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### Applicability of Presumption of Reliance: Fraud-on-the-Market Doctrine

187.   At all relevant times, the market for BT Group ADRs was an efficient market for the following reasons, among others:

(a)   BT Group ADRs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)   as a regulated issuer, BT Group filed periodic public reports with the SEC and the NYSE;

(c)   BT Group regularly communicated with public investors *via* established market communication mechanisms, including regular disseminations of press releases on the

national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     BT Group was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

188.     As a result of the foregoing, the market for BT Group ADRs promptly digested current information regarding BT Group from all publicly available sources and reflected such information in the prices of the securities.  Under these circumstances, all purchasers of BT Group ADRs during the Class Period suffered similar injury through their purchase of BT Group ADRs at artificially inflated prices and a presumption of reliance applies.

## COUNT I

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against BT Group

189.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

190.     During the Class Period, BT Group disseminated or approved the materially false and misleading statements specified above, which it knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

191.     BT Group: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the

statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ADRs during the Class Period.

192.    BT Group's knowledge of the falsity of its public statements has several factual bases.  First, BT Group admitted to intentional misconduct by at least five members of the senior management of BT Italy, all of whom were fired by BT Group.  These facts create a strong inference that someone whose intent could be imputed to BT Group acted with the requisite scienter.

193.    Furthermore, BT Group's Audit & Risk Committee was aware of sustained problems in the control environment of the Company's Italian operations.  In fiscal years 2013, 2014, 2015, and 2016, the Audit & Risk Committee placed special emphasis on investigating these problems, yet failed to: (1) put a stop to the rampant fraud that was taking place in BT Italy; and (2) disclose the true extent of the problems, despite assuring investors, through the Company's internal-control certifications, that there were no material weaknesses in internal controls.  These facts create a strong inference that someone whose intent could be imputed to BT Group acted with the requisite scienter.

194.    Additionally, in November 2015, three BT Italy employees warned BT Group's Vice President of Iberia and head of European sales, Jacinto Cavestany, about possible accounting problems at BT Italy, bullying by BT Italy management, especially its then-CEO, and pressure to meet difficult bonus targets.  These facts create a strong inference that someone whose intent could be imputed to BT Group acted with the requisite scienter.

195.     Moreover, due to the foregoing, Defendants Livingston, Patterson, and Chanmugam had access to information that contradicted their public statements and/or failed to check information they had a duty to monitor, to the extent that:

(i)      they had a statutory duty to monitor the Company's internal controls, and their failure to check information they had a duty to monitor constitutes recklessness;

(ii)     they admittedly: (1) were personally responsible for establishing and maintaining the Company's internal controls over financial reporting; and (2) personally designed such internal controls over financial reporting, or caused such controls over financial reporting to be designed under their supervision;

(iii)    as evidenced by the Company's own admissions, the Company did not maintain effective internal controls; and

(iv)     they falsely certified the efficacy of the Company's internal controls.

196.     These facts create a strong inference that someone whose intent could be imputed to BT Group acted with the requisite scienter.

197.     In addition, the Company committed significant violations of IFRS, and a government investigation of the wrongful conduct at the Company is ongoing.

198.     As a direct and proximate result of BT Group's wrongful conduct, Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for BT Group ADRs.  Plaintiffs and the Class would not have purchased BT Group ADRs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by BT Group's misleading statements.

**COUNT II**

**Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**
**Against Livingston, Patterson, and Chanmugam**

199.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

200.    During the Class Period, the defendants named herein disseminated or approved the materially false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

201.    The defendants named herein: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ADRs during the Class Period.

202.    The following facts, viewed holistically, establish the scienter of the defendants named herein:

        (a)      Senior management of BT Italy committed intentional misconduct;

        (b)      BT Group's Audit & Risk Committee was aware of sustained problems in the control environment of the Company's Italian operations during fiscal years 2013, 2014, 2015, and 2016, and reported their awareness of these problems in the Company's Annual Reports, which the defendants named herein reviewed and approved;

- 69 -

(c) in November 2015, three BT Italia employees warned BT Group's Vice President of Iberia and head of European sales about possible accounting problems at BT Italy, bullying by BT Italy management, especially BT Italy's then-CEO, and pressure to meet difficult bonus targets;

(d) due to the foregoing, the defendants named herein had access to information contradicting their public statements and/or failed to check information they had a duty to monitor, to the extent that:

(i) they had a statutory duty to monitor the Company's internal controls, and their failure to check information they had a duty to monitor constitutes recklessness;

(ii) they admittedly: (1) were personally responsible for establishing and maintaining the Company's internal controls over financial reporting; and (2) personally designed such internal controls over financial reporting, or caused such controls over financial reporting to be designed under their supervision;

(iii) as evidenced by the Company's own admissions, the Company did not maintain effective internal controls; and

(iv) they falsely certified the efficacy of the Company's internal controls;

(e) the Company committed significant violations of IFRS; and

(f) a government investigation of the wrongful conduct at the Company is ongoing.

203. As a direct and proximate result of the wrongful conduct committed by the defendants named herein, Plaintiffs and the Class have suffered damages in that, in reliance on the

integrity of the market, they paid artificially inflated prices for BT Group ADRs.  Plaintiffs and

the Class would not have purchased BT Group ADRs at the prices they paid, or at all, if they had

been aware that the market prices had been artificially and falsely inflated by Defendants'

misleading statements.

### COUNT III

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

204.    Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

205.    During the Class Period, the Individual Defendants participated in the operation

and management of BT Group, and conducted and participated, directly and indirectly, in the

conduct of BT Group's business affairs.  Because of their senior positions, they knew the adverse

non-public information about BT Group's false financial statements and materially weak internal

controls.

206.    As officers and/or directors of a publicly owned company, the Individual

Defendants had a duty to disseminate accurate and truthful information with respect to BT Group's

financial condition and results of operations, and to correct promptly any public statements issued

by BT Group that had become materially false or misleading.

207.    Because of their positions of control and authority as senior officers, the Individual

Defendants were able to, and did, control the contents of the various reports, press releases and

public filings that BT Group disseminated in the marketplace during the Class Period concerning

BT Group's results of operations.  Throughout the Class Period, the Individual Defendants

exercised their power and authority to cause BT Group to engage in the wrongful acts complained

of herein.  The Individual Defendants, therefore, were "controlling persons" of BT Group within

the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of BT Group ADRs.

208.    Each of the Individual Defendants, therefore, acted as a controlling person of BT Group.  By reason of their senior management positions and/or being directors of BT Group, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, BT Group to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of BT Group and possessed the power to control the specific activities that comprise the primary violations about which Plaintiffs and the other members of the Class complain.

209.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by BT Group.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A.    Determining that this action is a proper class action, and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other relief as the Court deems just and proper.

**<u>JURY DEMAND</u>**

Plaintiffs hereby demand a trial by jury.

DATED:  November 21, 2017        CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
*Liaison Counsel for Plaintiffs*


By: \_\_\_/s/ James E. Cecchi_____
        JAMES E. CECCHI

Samuel H. Rudman
David A. Rosenfeld
Alan I. Ellman
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
(631) 367-7100

*Lead Counsel for Plaintiffs*

Corey D. Holzer
Marshall P. Dees
HOLZER & HOLZER, LLC
200 Ashford Center North, Suite 300
Atlanta, GA 30338
(770) 392-0090

*Additional Plaintiffs' Counsel*