UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAMES CHRISTIAN, *individually and on behalf of all others similarly situated*, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>BT GROUP PLC, GAVIN PATTERSON, IAN LIVINGSTON, and TONY CHANMUGAM,<br><br>Defendants. | No. 2:17-cv-497-KM-JBC<br><br>OPINION |

### KEVIN MCNULTY, U.S.D.J.:

Plaintiffs bring a putative securities class action against BT Group PLC and three high-ranking individuals associated with that company. Plaintiffs allege that defendants were knowledgeable—or reckless in their ignorance of—fraudulent practices in one of BT Group PLC's many subsidiaries, BT Italy. According to plaintiffs, defendants made materially false or misleading statements; plaintiffs relied on those statements when investing in BT Group securities; and plaintiffs allegedly were damaged as a result. Now before the court is defendants' motion to dismiss the complaint for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). Defendants argue that plaintiffs have failed to plead scienter. For the reasons stated below, the defendants' motion to dismiss the complaint is granted.

1

## I. BACKGROUND[1]

The lead plaintiffs, Plumbing & Mechanical Contractors Association of Hawaii-United Association ("PAMCAH-UA") Local 675 Pension Fund, Gary Classen, Alice Korenblat, Robert Korenblat, and Pierre-S. Lefebvre (collectively, "plaintiffs") pursue a putative securities class action against BT Group PLC ("BT Group") and individuals associated with BT Group. (AC ¶¶ 1, 18-24). The individual defendants are Ian Livingston, the CEO and a member of the Board from 2008 until September 2013; Gavin E. Patterson, the CEO and a member of the Board from September 2013 to the present; and Tony Chanmugam, the Group Finance Director and a member of the Board from 2008 until July 2016. (AC ¶¶ 20-22, 24).

Plaintiffs purchased BT Group American Depositary Receipts ("ADRs")— i.e., certificates issued by a U.S. bank representing a specified number of shares in a foreign stock traded on a U.S. exchange. (AC ¶ 17).[2] Plaintiffs argue that defendants engaged in securities fraud from May 10, 2013 to January 23, 2017, inclusive (the "Class Period"). (AC ¶ 1). They pursue claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5. (AC ¶ 1).

### A. BT Group and BT Italy

Defendant BT Group, formerly known as British Telecom, is a provider of communication services and solutions serving customers in 180 countries. (AC ¶ 37). BT Group has six customer-facing business lines; one of them is BT Global Services. (AC ¶ 38). BT Global Services provides technology consulting, outsourcing, and communications systems for more than 10,000 organizations and governments worldwide. (AC ¶ 38). Defendant Alvarez became CEO of BT

---

[1] All facts and inferences are made in favor of the nonmoving party on a motion to dismiss. References to the Amended Complaint (ECF No. 26) are abbreviated "AC."

[2] *See American Depositary Receipts*, U.S. Sec. & Exchange Commission, https://www.sec.gov/fast-answers/answersadrshtm.html.

2

Global Services in 2012. (AC ¶ 38). Corrado Sciolla was President of BT Global Services in Continental Europe, which includes BT Italy. (AC ¶ 38).

Plaintiffs allege that defendants knew that BT Group's operations in Italy suffered from control problems at least from the beginning of the Class Period—i.e., May 10, 2013. (AC ¶ 40). Since fiscal year 2013, which ended on March 30, 2013, BT Group's Audit & Risk Committee ("Audit Committee") had been assessing the "control environment" in Italy. (AC ¶ 40). Plaintiffs claim that defendants Livingston, Patterson, and Chanmugam certified the efficacy of BT Group's internal controls despite rampant fraud at BT Italy. (AC ¶ 40).

Plaintiffs allege that BT Group's annual reports evince defendants' knowledge of control problems at BT Italy. The Audit Committee stated in BT Group's 2014 annual report that, "This year the Audit & Risk Committee paid special attention to several overseas locations that are important to BT Global Services, including Italy and Brazil .... We have received detailed presentations from key personnel in each of these areas and reviewed management's mitigation plans." (AC ¶ 42). Nick Rose, Chairman of the Audit Committee, noted, "I reported last year that the committee had given particular focus to BT's operations in Italy. We have continued to monitor the position there and significant progress has been made to improve the control environment." (AC ¶ 43). Rose made a similar statement in the 2015 annual report. (AC ¶ 44). The 2015 annual report also stated that the Audit Committee "asked management to provide us with greater detail on the governance and control in relation to ... operations in Italy." (AC ¶ 45). BT Group's 2016 annual report stated that the Audit Committee has "continued to monitor our operations in Italy and progress has been made to improve the control environment." (AC ¶ 47). HSBC Global Research noted that the Audit Committee had an unusual, "sustained" level of review regarding BT Group's control environment in Italy. (AC ¶ 48).

### B. Disclosures in 2016 and 2017

BT Group reported on October 26, 2016 that it had to take a write-down of £145 million (approximately $191 million) due to "certain historical

3

accounting errors" at its BT Italy division. (AC ¶¶ 49-50). BT Group's press release stated, "Following allegations of inappropriate management behaviour in our BT Italia operations, we have conducted an initial internal investigation [and ...] identified certain historical accounting errors and reassessed certain areas of management judgment." (AC ¶ 50). On October 27, 2016, the price of BT Group ADRs fell $0.57, or 2.4%, to close at $23.25 per ADR. (AC ¶ 51).

In a press release on January 24, 2017, BT Group announced that it would increase the write-down regarding its Italian operations to £530 million (approximately $700 million)—a nearly four-fold increase. (AC ¶ 52). Additionally, BT Group stated it no longer expected revenue growth for the next two years. (AC ¶ 52). The company also estimated its 2016-2017 free cash flow at £2.5 billion, about £700 million lower than the original forecast. (AC ¶ 52).

BT Group explained that its investigations had revealed that "the extent and complexity of inappropriate behaviour in the Italian business were far greater than previously identified" and had revealed "improper accounting practices and a complex set of improper sales, purchase, factoring and leasing transactions," resulting in the "overstatement of earnings in our Italian business over a number of years." (AC ¶ 53). BT Group suspended members of BT Italy's senior management team and appointed a new Chief Executive of BT Italy. (AC ¶ 53). The new Chief Executive was told to review the Italian management team and improve the governance, compliance, and financial safeguards of the Italian business. (AC ¶ 53).

On a conference call around this time, Simon Lowth, the company's Group Finance Director, made the following statement:

> The majority component [of unwinding the improper working capital transactions] was to repay essentially working capital loans to factoring companies where loans had been taken against receivables and, indeed, had been taken to pay suppliers. Those working capital loans [were] clearly improper and we are unwinding them, and that is overwhelmingly the most significant contributor to the onetime cash unwind in the 2016/2017.

4

(AC ¶ 55). Lowth also identified "additional smaller contributors" to BT Italy's woes, such as "sale and leaseback transactions." (AC ¶ 55).

On January 24, 2017, media outlets reported that BT Group suspended a number of senior executives in Italy, including the BT Italy CEO. (AC ¶ 58). They also reported that Corrado Sciolla, the President of BT Global Services in Continental Europe, was expected to resign shortly. (AC ¶ 58). Sciolla had previously been the BT Italy CEO from 2006 until January 2013. (AC ¶ 58). On January 24, 2017, the price of BT Group ADRs fell $5.05, or approximately 21%, to close at $19.38 per ADR. (AC ¶ 59). On January 28, 2017, a media outlet reported that a KPMG LLP investigation found that the misconduct had been ongoing at BT Italy for most of the past ten years. (AC ¶ 61).

### C. Report to BT Group Vice President in 2015

On March 30, 2017, *Reuters* reported that, in November 2015, three BT Italy employees warned their Madrid-based supervisor Jacinto Cavestany about this potential fraud. (AC ¶ 62). Jacinto Cavestany was BT Global Services' Vice President of Iberia and Head of Sales in Europe and Latin America. (AC ¶ 62). The source claimed that the BT Italy employees met with Cavestany on the sidelines of a Company gathering to express concern over the unit's financial results, bullying by local management, and intense pressure to meet difficult bonus targets. (AC ¶ 62). The source added that Cavestany had replied that the three BT Italy employees should help him steer Cimini, the then-BT Italy CEO, "in the right direction." (AC ¶ 62).

BT Group claimed that it launched an internal investigation in January 2017—almost a year after the BT Italy employees met with Cavestany about the BT Italy fraud. (AC ¶ 63). According to *Reuters*, a network of people at BT Italy had exaggerated revenues from certain BT-installed phone lines, faked contract renewals and invoices, and invented bogus supplier transactions to meet bonus targets and disguise the unit's true financial performance. (AC ¶ 65). These practices had allegedly been ongoing since at least 2013. (AC ¶ 65).

For instance, BT Italy's purchasing office made fake purchase orders to suppliers with no intention of receiving goods; the office would cancel the order and ask the supplier to issue a credit note by way of refund, and the bogus credit notes were then sold to a factoring company for cash. (AC ¶ 68). BT Italy also had multiple internal-accounting systems that enabled staff to inflate revenues by entering duplicate invoices for the same client. (AC ¶ 69).

### D. Criminal Complaint, Italian Government Investigation

On April 21, 2017, *Reuters* reported that BT Group filed a criminal complaint with Italian prosecutors on March 21, 2017 over the accounting scandal. (AC ¶ 72). BT Group accused several former BT Italy executives and other employees of breaking company rules and committing unlawful conduct. (AC ¶¶ 72-75).

Additionally, BT Group is being investigated by the Guardia di Finanza, an Italian law-enforcement agency responsible for prosecuting financial crimes. (AC ¶ 76). The Guardia di Finanza has raided BT Italy offices, interviewed employees, and collected records. (AC ¶¶ 76-78).

### E. BT Group's 2017 Annual Report

BT Group's 2017 annual report, filed on May 25, 2017, stated that adjustments related to the investigation of BT Italy amounted to £268 million for errors in prior years, £245 million for changes in accounting estimates, and £15 million for investigation costs. (AC ¶ 79). BT Group stated that its operating cashflow of £245 million was £396 million worse than last year. (AC ¶ 82). BT Group also provided a summary of adjustments reconciling the fiscal 2016 and fiscal 2015 financial years.

### F. Clawback and Denial of Bonuses

BT Group clawed back previously awarded bonuses and denied bonuses for the current year to the company's executive directors, including defendants Patterson and Chanmugam. (AC ¶ 84). BT Group said that this action placed the executives in the same position they would have been in if the bonuses had been based on accurate results. (AC ¶ 84).

6

### G. Allegedly Materially False or Misleading Statements

Plaintiffs allege that defendants made materially false or misleading statements during fiscal years 2013 through 2017. (AC ¶¶ 87-119). These alleged statements include: (1) BT Group's quarterly and year-end financial results; (2) statements that BT Group's internal control over financial reporting was sufficient; (3) certifications by the CEO and CFO about internal controls and disclosure controls; and (4) reports about the Audit Committee's attention to BT Italy. (AC ¶¶ 87-180). Plaintiffs allege that defendants knew about—or recklessly disregarded—the issues with BT Italy but made these statements anyway.

Plaintiffs claim that these statements directly or proximately caused plaintiffs to purchase or trade in ADRs at inflated prices, and that they were damaged as a result. (AC ¶¶ 120-23). Count One alleges violations of Section 10(b) of the Exchange Act and Rule 10b-5 against BT Group. (AC ¶¶ 189-98). Count Two alleges a violation of Section 20(a) against Livingston, Patterson, and Chanmugam. (AC ¶¶ 199-209).

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a motion to dismiss under Rule 12(b)(6), a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

A plaintiff asserting securities-fraud claims pursuant to Section 10(b) of the Securities Exchange Act and Rule 10b-5 must meet the heightened pleading standard as set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA"). 15 U.S.C. § 78u-4(b). Under the PSLRA, a complaint alleging a false or misleading statement must: "(1) 'specify each statement alleged to have

7

been misleading [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u-4(b)(1), and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' *Id.* § 78u-4(b)(2)." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 241-42 (3d Cir. 2013) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007)) (internal quotations omitted). The required state of mind is "scienter," which is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319.

That PSLRA "particularity" standard has elements in common with the pleading requirements for fraud set forth in Federal Rule of Civil Procedure 9(b). *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009); *see* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). Rule 9(b), however, is both subsumed and supplemented by the requirements of Section 78u-4(b)(1) of the PSLRA. *Id.* (citing *Miss. Pub. Emps. Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 85 n.5 (1st Cir. 2008)). Like rule 9(b), the PSLRA requires that a plaintiff plead the "who, what, when, where and how." *Id.* Section 78u-4(b)(1) adds a specialized requirement, however, where "an allegation regarding [a defendant's] statement or omission is made on information or belief." *Id.*; *see* 15 U.S.C. § 78u-4(b)(1). In such a case, plaintiff must "state with particularity all facts on which that belief is formed"; that is, the complaint must "describe the sources of information with particularity, providing the who, what, when, where and how of the sources, as well as the who, what, when, where, and how of the information those sources convey." *Id.*

The PSLRA also exceeds the requirements for pleading scienter contained in Rule 9(b), which permits such mental states to be alleged generally. *Id.* As interpreted by the Supreme Court, PSLRA's particularity requirement requires that the facts pled give rise to a "strong inference" of scienter. A court considering a motion to dismiss for failure to plead scienter must weigh the "plausible, nonculpable explanations for the defendant's conduct" against the

8

"inferences favoring the plaintiff." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007). A "strong inference" of scienter must thus be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314; *see also id.* at 324. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." (internal quotation marks omitted)). The pertinent question is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23; *see also id.* at 325 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."). Omissions and ambiguities "count against inferring scienter." *Id.* at 326.

Those PSLRA pleading requirements apply whether the alleged fraudulent statement at issue is an assertion of current fact or a prediction of the future. *Avaya*, 564 F.3d at 253-54. However, when an allegation involves a prediction, the Safe Harbor provision of the PSLRA immunizes from liability any forward-looking statement that "is identified as such and accompanied by meaningful cautionary language; or is immaterial; or [where] the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Id.* at 254; 15 U.S.C. § 78u-5(c).

### III. DISCUSSION

#### A. Section 10(b) and Rule 10b-5 Allegations

To state a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014). As discussed in detail above, the element of scienter must be pled with particularity. *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 253 (3d

9

Cir. 2009). Defendants move to dismiss the amended complaint solely on the basis of the element of scienter.

I will first discuss **(i)** whether plaintiffs adequately alleged scienter in relation to the Audit Committee and the individual defendants. I will then discuss **(ii)** whether plaintiffs can satisfy the scienter requirement by pleading "corporate scienter."

### i. Scienter of the Audit Committee and Individual Defendants

Plaintiffs posit that the Audit Committee and the individual defendants— i.e., Livingston, Patterson, and Chanmugam—were aware that the internal controls in BT Italy were insufficient. According to plaintiffs, these defendants possessed scienter because they knew, or were reckless in ignoring, significant concerns that were raised in BT Group's annual reports.

In the 2013 annual report, the Chair of the Audit Committee noted that, "We received updates on security and resilience, cybersecurity, BT's network, major contracts, BT's operations in Italy, customer data handling, litigation trends, as well as updates on major litigation and competition and regulation." (AC ¶ 91).

The 2014 annual report stated as follows:

This year the Audit & Risk Committee paid special attention to several overseas locations that are important to BT Global Services, including Italy and Brazil, to data security and to the increasing cyber security threat.... I reported last year that the committee had given particular focus to BT's operations in Italy. We have continued to monitor the position there and significant progress has been made to improve the control environment.

(AC ¶ 99).

The 2015 annual report reported that the Audit Committee "asked management to provide us with greater detail on the governance and control in relation to ... operations in Italy." (AC ¶ 107). The Audit Committee chairperson also stated, "I reported last year that the committee had given particular focus to BT's operations in Italy and Brazil. We have continued to monitor the

10

position and significant progress has been made to improve the control environment." (AC ¶ 107). The Board also visited BT Italy to "review[] operational matters with senior managers, me[et] with employees as well as customers, government officials and opinion leaders." (AC ¶ 108).

The 2016 annual report included this statement from the Audit Committee: "We have continued to monitor our operations in Italy and progress has been made to improve the control environment. We continue to keep under review the current trends of security risks facing BT and the progress made to manage these risks." (AC ¶ 116).

Defendants state that BT Italy contributed "approximately one percent to BT Group's EBITDA"[3] and employed "only about one percent of BT Group's total workforce." (ECF No. 28-2, p. 5). Defendants suggest that the high-ranking officers and executives at BT Group did not know the specifics regarding the control environment at BT Italy, one of 300 subsidiaries. Plaintiffs counter that BT Group and the individual defendants should have been alerted by the Audit Committee's focus on BT Italy. (ECF No. 33, p. 15). As a result, plaintiffs claim, the individual defendants were at least reckless in certifying the effectiveness of BT's internal controls in Sarbanes-Oxley disclosures. (ECF No. 33, p. 18).

The theory, then, is that BT Group was put on notice of fraud at BT Italy by the Audit Committee's interest, and that the individual defendants were therefore reckless in failing to discover and disclose it. Plaintiffs rely on *Avaya*, where the Third Circuit wrote that a defendant who was "not aware of the full extent" of fraudulent practices "might be culpable as long as what he knew made obvious the risk that his confident, unhedged denial of [fraudulent practices] misled investors." *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009). In *Avaya*, the Third Circuit held that the defendant's

---

[3] Earnings before interest, taxes, depreciation, and amortization.

11

conduct was potentially reckless because the CFO "explicitly denied the existence of [unusual] discounting" several times even though several signs pointed to it: confidential witnesses alleged widespread discounting with some of the company's largest clients, discounting was of central importance to market competitiveness, there were repeated questions about discounting by analysts and investors, and there was a steep decline in the company's "all-important margins" (which were directly tied to discounts and pricing). *Id.* at 269-71. The Third Circuit accepted that those indicators would reasonably have alerted the CFO that his categorical, unhedged denials were incorrect. *Id.*

The factual circumstances in *Avaya* were different from those alleged here. The CFO in *Avaya* was confronted with facts about large clients and core products, facts that directly contradicted his unhedged public statements. Here, by contrast, the individual defendants had reports of internal-control problems at one of BT Group's 300 subsidiaries. The reports did not reveal fraud or point out problems with the company's core operations or products. The warnings, such as they were, involved potential control issues; in themselves, they did not alert these defendants that the company's public statements were incorrect.

Plaintiffs argue that the individual defendants should have inquired about BT Italy's situation sooner. It is true that an officer or director "cannot ignore the facts and plead ignorance of the risk." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008); *see Avaya*, 564 F.3d at 270. However, "an allegation of mismanagement on the part of defendant will not alone support a claim under § 10(b) or Rule 10b-5; nor will an allegation that a defendant failed to disclose the existence of mismanagement." *Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir. 1992) (citing *Shapiro v. UBJ Fin. Corp.*, 964 F.2d 272, 280-83 (3d Cir. 1992)). Here, the mere fact that the Audit Committee was looking into the management and accounting controls in place at BT Italy was not enough to tip the balance, given the stiff PSLRA pleading standard: "Knowing enough to launch an investigation," the Seventh Circuit has written,

"is a very great distance from convincing proof of intent to deceive." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 758 (7th Cir. 2007). "[F]raud cannot be inferred simply because [the parent corporation] might have been more curious or concerned about the activity at [its subsidiary]." *In re Stonepath Grp., Inc. Sec. Litig.*, No. 4-cv-4515, 2006 WL 890767, at \*12 (E.D. Pa. Apr. 3, 2006), *aff'd sub. nom. Globis Capital Partners, L.P. v. Stonepath Grp., Inc.*, 241 F. App'x 832 (3d Cir. 2007); *see Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996) (same); *see also In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 554 (6th Cir. 1999) (holding that courts "should not presume recklessness or intentional misconduct from a parent corporation's reliance on its subsidiary's internal controls"). The issue, after all, is not negligence, but scienter.

The allegations in this complaint do not raise a plausible inference that the individual defendants turned a "blind eye" to "red flags" or had "no reasonable basis" for certifying the Sarbanes-Oxley reports. The more reasonable inference is that these individual defendants were unaware of the fraud or other problems at BT Italy that later emerged.

Plaintiffs therefore do not sufficiently plead scienter regarding the individual defendants. In the next subsection, I will address whether the plaintiffs can pursue their Section 10(a) and Rule 10b-5 claims by pleading "corporate scienter."

### ii. Corporate Scienter

Plaintiffs attempt to invoke the "corporate scienter" doctrine to impute scienter to BT Group. Other courts have permitted plaintiffs to plead "corporate scienter" without successfully pleading scienter against any individual defendant. *See, e.g., City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 656-59 (6th Cir. 2005). Such decisions require a strong inference that someone in the corporation—who is not, but could have been an individual defendant—must have acted with scienter in making materially false

13

or misleading statements. *See id.*; *see also Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).

The Third Circuit has "neither ... accepted nor rejected the doctrine of corporate scienter in securities fraud actions." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246 (3d Cir. 2013); *see also City of Roseville Emps. Ret. Sys. v. Horizon Lines, LLC*, 442 F. App'x 672, 676-77 (3d Cir. 2011) (declining to decide "if ... it were possible to plead scienter against a corporation without pleading scienter against an individual"). In *City of Roseville*, however, the Third Circuit suggested that plaintiffs might invoke the corporate-scienter doctrine in unique and extraordinary circumstances. 442 F. App'x at 676-76. *Roseville* pointed to *Bridgestone Corp.*, where a tire manufacturer and its subsidiary Firestone had information that their tires were rupturing and causing problems, including a significant number of rollover accidents. *City of Roseville*, 442 F. App'x at 676-76 (citing *Bridgestone Corp.*, 399 F.3d at 656-59). Bridgestone and Firestone allegedly engaged in a variety of tactics, including a large-scale secret settlement with State Farm Insurance Co., to keep news of the scope of the problem from reaching safety regulators and investors. *Bridgestone Corp.*, 399 F.3d at 690-91. After the truth was revealed, plaintiffs filed a securities-fraud action. The Sixth Circuit affirmed dismissal of the claims against the individual defendants but held that the facts supported corporate scienter. *Id.*

In *Roseville*, the Third Circuit cited a hypothetical posited by the Seventh Circuit to explain when an inference of corporate scienter might be appropriate:

> Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.

*City of Roseville*, 442 F. App'x at 676-77 (citing *Tellabs*, 513 F.3d at 710).

In the *Tellabs* case, the corporate defendant announced that its principal product, accounting for more than half its sales, was being replaced by a

14

successor product. 513 F.3d at 706. The corporate defendant asserted that the successor product was "available now," that "customers [we]re embracing" it, and that Sprint had signed a multiyear $100 million contract to buy it. *Id*. The product was not actually sold at all during the class period. *Id*. The Seventh Circuit inferred corporate scienter because it was highly implausible that key executives in the corporation would not have known whether its principal product was currently being sold. *Id.*[4]

Assuming *arguendo* that the Third Circuit would permit a complaint to plead "corporate scienter" without pleading scienter against an individual, the facts alleged by plaintiffs here would not suffice to create such an inference. I consider the facts alleged in support of corporate scienter:

**(a)** *BT Italy executives were aware of the fraud.* First, the Third Circuit has declined to impute the scienter of a subsidiary to a parent. *See Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246 (3d Cir. 2013). The "knowledge and actions of a subsidiary company's agents cannot be imputed to the parent company." *Pathfinder Mgmt., Inc. v. Mayne Pharma, Inc.*, No. 6-cv-2204, 2009 WL 4250061, at *9 (D.N.J. Nov. 25, 2009). That BT Italy executives were allegedly knowledgeable about the fraud does not mean that the parent company's executives from BT Group were aware. Moreover, as stated above, BT Italy is a small subsidiary representing a small fraction of EBITDA.

**(b)** *Jacinto Cavestany, BT Group Services' Vice President of Iberia & Head of Sales in Europe and Latin America, was informed through news articles about potential fraud at BT Italy.* This does not support an inference of corporate scienter. Even assuming that the news-article allegations are credible, they do not support an inference of corporate scienter. Cavestany worked for BT Group Services, a subsidiary of BT Group. Even on the generous assumption that

---

[4] The Second Circuit has placed more emphasis on the identification of an individual whose scienter can be imputed to the corporation—*i.e.*, when "the pleaded facts ... create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

15

Cavestany knew of fraud at BT Italy, his knowledge cannot be imputed to BT Group. *Cf. City of Roseville Emps. Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 403 (D. Del. 2010) ("[A] corporate defendant will not be held liable absent a showing that at least one individual officer who made, or participated in the making of, a false or misleading statement did so with scienter.").

**(c)** *BT Group clawed back compensation from the individual defendants Patterson and Chanmugam.* BT Group's reduction of the pay of executives to reflect actual performance does not give rise to a compelling inference of scienter. No facts are pled to suggest that the reduction in pay was due to their participation in any fraud. *Cf. City of Roseville*, 713 F. Supp. 2d at 398. The complaint alleges that the Remuneration Committee recalculated the bonuses to reflect the actual financial results of BT Italy's business.

**(d)** *The Italian government has investigated BT Italy.* The existence of an investigation by the Italian government does not support a strong inference of scienter on the part of BT Group.

> [C]ourts have considered a governmental investigation as one piece of the puzzle when taking a 'holistic' view of the purported facts as they relate to scienter.... [W]hile the existence of an investigation alone is not sufficient to give rise to a requisite cogent and compelling inference of scienter, it may be considered by the Court as part of its analysis.

*In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013). I consider the Italian investigation, but in context with the other facts it does not support a strong inference of scienter.

**(e)** *There were GAAP violations.* GAAP violations do not themselves create a strong inference of scienter. Courts have found that GAAP violations can support an inference of scienter, but do not independently create such an inference. *See In re Intelligroup Sec. Litig.*, 527 F. Supp. 2d 262, 349-52 (D.N.J. 2007) (synthesizing case law).

**(f)** *High-ranking officials resigned or were terminated after the fraud was disclosed.* The termination of BT Italy and BT Global Services employees does

16

not give rise to a strong inference of scienter. As stated before, the "knowledge and actions of a subsidiary company's agents cannot be imputed to the parent company." *Pathfinder Mgmt.*, 2009 WL 4250061, at *9. Even if the employees of a BT Group subsidiary knew about or participated in the fraud, no facts compel the inference that BT Group officers or executives possessed scienter.

**(g)** *Other miscellaneous facts, such as the duration of the fraud or the Board's visit to Italy.* These do not create a compelling inference of scienter among individuals whose scienter could be imputed to the parent company.

"[T]aken collectively," as called for by *Tellabs*, 551 U.S. at 323, the facts and allegations presented by plaintiffs are not so fundamental and pervasive as to support an inference of corporate scienter, as in the *Bridgestone* case (rupturing tires, followed by a coverup) or the General Motors hypothetical (nonexistent SUV sales). There, it was inconceivable that the corporation lacked scienter, even if a particular individual with scienter was not identified and sued. Here, the control issues at BT Italy did not implicate such fundamental corporate matters. Here, based on the allegations, it is at least as likely that key individuals at BT Group were unaware of the fraud, were not reckless in ignoring it, and reacted appropriately when the relevant facts came out. Even if the corporate-scienter doctrine was permitted in this Circuit, these facts would not satisfy that doctrine. Plaintiffs' Section 10(b) and Rule 10b-5 claims are thus dismissed for failure to adequately plead corporate scienter.

### B. Section 20(a) Allegations

Since plaintiffs fail to adequately state Section 10(b) and Rule 10b-5 claims, the Section 20(a) claims against the individual defendants fail as well. Liability under Section 20(a) is predicated upon an independent violation of "this chapter or the rules or regulations thereunder." 15 U.S.C. § 78t-1(a); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 207 (1st Cir. 1999). Claims under Section 20(a) therefore, are "derivative—requiring proof of a separate underlying violation of the Exchange Act." *In re Milestone Scientific Sec. Litig.*, 103 F. Supp. 2d 425, 474 (D.N.J. 2000). Because the plaintiffs have not pled a

predicate violation of Section 10(b) or Rule 10b-5, the Section 20(a) claim is dismissed.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted, without prejudice, to the filing of an amended complaint within 30 days.

An appropriate order accompanies this opinion.

Dated: August 1, 2018

KEVIN MCNULTY
United States District Judge