UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAMES CHRISTIAN, *individually and on behalf of all others similarly situated*,<br><br>    Plaintiff,<br><br>    v.<br><br>BT GROUP PLC, GAVIN E. PATTERSON, IAN LIVINGSTON, TONY CHANMUGAM, LUIS ALVAREZ, and NICK ROSE<br><br>    Defendants. | Civ. No. 17–497 (KM) (JBC)<br><br>OPINION |

**KEVIN MCNULTY, U.S.D.J.:**

  Plaintiffs bring a putative securities class action under Section 10(b) of the Securities Exchange Act and Rule 10b-5 against BT Group PLC and several high-ranking individuals associated with that company. Plaintiffs allege that defendants were knowledgeable—or reckless in their ignorance of—fraudulent practices in one of BT Group PLC's many subsidiaries, BT Italy. According to Plaintiffs, Defendants made materially false or misleading statements; Plaintiffs relied on those statements when investing in BT Group securities; and Plaintiffs allegedly were damaged as a result. Now before the court is Defendants' motion to dismiss the fourth amended complaint for failure to state a claim. (DE 68). [1] *See* Fed. R. Civ. P. 12(b)(6). Defendants argue that Plaintiffs have failed to plead scienter and that the individual defendants did not make misleading statements.

  For the reasons stated below, Defendants' motion to dismiss the complaint is **GRANTED**.

---

[1]   "DE __" refers to the docket entries in this case.

## I. BACKGROUND

I write for the parties; familiarity with the matter, and particularly with my earlier opinion (DE 40) dismissing the first amended complaint, is assumed. I will, however, summarize the developments between the first and fourth amended complaints, including the procedural history and the new allegations.

On August 1, 2018, this Court issued an opinion and order dismissing Plaintiffs' first amended complaint for failing to meet the heightened pleading standard required by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b). (DE 40 & 41).

On October 1, 2018, Plaintiffs filed a second amended complaint. (DE 47). Defendants moved to dismiss that complaint. (DE 48). On December 28, 2018, with the parties' consent, Plaintiffs filed a third amended complaint, which added BARC Chairman Nick Rose as an individual defendant, but was otherwise substantially identical to the second amended complaint. (DE 54). Defendants moved to dismiss that complaint as well. (DE 55).

After that motion to dismiss was fully briefed, Plaintiffs filed several letters with the Court that "purport[ed] to supplement the complaint's allegations." (Memo & Procedural Order, DE 64 at 1). Although the Court found that Defendants' motion to dismiss could not "be defeated by the belated submission of additional facts and evidence outside the four corners of the complaint," the Court found it likely that "even if the third amended complaint were dismissed on an as-is basis, the plaintiffs would move to amend it to incorporate their supplemental allegations." (*Id.*). To avoid "wast[ing] the resources of the parties or the court," the Court administratively terminated defendants' motion to dismiss and granted Plaintiffs leave to file another amended complaint within thirty days. (*Id.* at 1–2.)

On August 16, 2019, Plaintiffs filed a fourth amended complaint, which added new allegations and Section 10(b) claims against Luis Alvarez and

Richard Cameron.[2] (DE 65). The new allegations of the fourth amended complaint are as follows.

1. "[A]t the start of 2016, [BT Group] received reports of bullying cases at BT Italy, in response to which senior Human Resources officials visited the Italian offices and investigated," and despite this, individual defendant Rose "stated in BT Group's 2016 Annual Report [that it] continued to monitor [its] operations in Italy and progress has been made to improve the control environment" (DE 65 ¶¶ 11, 83, 273 & 280(h));

2. Anonymous BT Italy sources told *Reuters* that "it would be impossible that London had no way of realizing what was happening in Italy and . . . for an auditor not to realize that something was amiss" (DE 65 ¶¶ 5, 93, 270 & 280(f));

3. According to news articles, BT Italy's former CEO and CFO announced that BT Italy financial transactions were verified and authorized by BT Group (DE 65 ¶¶ 5, 92 & 266);

4. Italian prosecutors identified defendants Alvarez and Cameron as "suspects in the criminal case" and accused them of "setting unrealistically high business targets and of complicity in false accounting at BT Italy" (DE 65 ¶¶ 98–99 & 253); and

5. An internal report by KPMG shows that "executives at BT global services did not sufficiently challenge numbers submitted by Italian staff," "inquiries from London were ignored or met by [unsatisfactory] responses," and "global services staff often failed to follow through to get answers" (DE 65 ¶¶ 12 & 113).

Also newly alleged is the scienter of two individual defendants:

---

[2]   Cameron is a new defendant. Alvarez has been a defendant from the outset, but Plaintiffs had not previously alleged a Section 10(b) claim against him.

6. Plaintiffs reiterate their earlier claim that "BT Group applied the malus provisions to all of [former BT Group CFO Tony] Chanmugam's Deferred Bonus Plan ('DBP') awards." (DE 65 ¶ 7; *see also* DE 35 at 1–2).
7. Plaintiffs also allege that "Chanmugam was either fired or preemptively quit in July 2016 in connection with BT Group's internal investigation of BT Italy." (DE 65 ¶¶ 7, 128–31, 272 & 280(g)).
8. Plaintiffs allege that Alvarez sold BT Group shares worth approximately £675,000 in December 2016. (DE 65 ¶¶ 101 & 254).

The fourth amended complaint relies on six news articles which, according to Plaintiffs, demonstrate Defendants' scienter. They are:

1. *Reuters*, "EXCLUSIVE - BT Italia, from the 'sink' to 'double billing' on its balance sheets. First Sos [*sic*] in November 2015" (September 27, 2018) (translated from Italian) (DE 65-1). The article cites a KPMG report of BT Group and anonymous sources who questioned BT Italy's accounting practices and discusses
2. *Reuters*, "Exclusive: BT executives knew of accounting fraud in Italy unit – prosecutors" (undated). (DE 65-2). The article describes a report produced by Italian prosecutors investigating BT Italy.
3. *The Telegraph*, "Former BT bosses named as suspects in Italian fraud scandal" (February 13, 2019). (DE 65-3). The article alleges that Alvarez, Cameron, and non-defendant Corrado Sciolla—the Global Services officer who oversaw operations on the continent—knew of the ongoing fraud at BT Italy.
4. *Reuters*, "Exclusive: British Telecom's Italian job had London roots, say investigators" (undated). (DE 65-4). The article describes the Italian prosecutors' report and emails from non-defendant Brian More O'Ferrall—BT Wholesale's finance director—that Plaintiffs allege demonstrate Defendants' knowledge of ongoing fraud.
5. *Reuters*, "BT Italia inquiry, former CFO and email point to top management" (April 23, 2019) (translated from Italian). (DE 65-5). The

4

  article describes the accusations of Luca Sebastiani, BT Italy's former CFO.

6. *Daily Mail*, "British chiefs in firing line over BT accounting fraud scandal in Italy" (April 28, 2019). (DE 65-6). The article describes BT Group's internal review of the fraud scandal that was memorialized, but never published, in a report by KPMG.

## II. DISCUSSION

### A. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a motion to dismiss under Rule 12(b)(6), a court must take all allegations in the complaint as true and view them in the light most favorable to the plaintiff. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975); *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

A plaintiff asserting securities-fraud claims pursuant to Section 10(b) of the Securities Exchange Act and Rule 10b-5 must meet the heightened pleading standard as set forth in the Private Securities Litigation Reform Act of 1995 ("PSLRA"). 15 U.S.C. § 78u-4(b). Under the PSLRA, a complaint alleging a false or misleading statement must: "(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u-4(b)(1), and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' *Id.* § 78u-4(b)(2)." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 241-42 (3d Cir. 2013) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007)) (internal quotations omitted). The required state of mind is "scienter," which is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319.

That PSLRA "particularity" standard has elements in common with the pleading requirements for fraud set forth in Federal Rule of Civil Procedure 9(b). *See Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). Rule 9(b), however, is both subsumed and supplemented by the requirements of Section 78u-4(b)(1) of the PSLRA. *Id.* (citing *Miss. Pub. Emps. Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 85 n.5 (1st Cir. 2008)). Like Rule 9(b), the PSLRA requires that a plaintiff plead the "who, what, when, where and how." *Id.* Section 78u-4(b)(1) adds a specialized requirement, however, where "an allegation regarding [a defendant's] statement or omission is made on information or belief." *Id.*; *see also* 15 U.S.C. § 78u-4(b)(1). In such a case, a plaintiff must "state with particularity all facts on which that belief is formed"; that is, the complaint must "describe the sources of information with particularity, providing the who, what, when, where and how of the sources, as well as the who, what, when, where, and how of the information those sources convey." *Id.*

The PSLRA also exceeds the requirements for pleading scienter contained in Rule 9(b), which permits such mental states to be alleged generally. *Id.* As interpreted by the Supreme Court, the PSLRA requires that the facts pled give rise to a "strong inference" of scienter. A court considering a motion to dismiss for failure to plead scienter must weigh the "plausible, nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 323–24. A "strong inference" of scienter must thus be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314; *see also id.* at 324. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." (internal quotation marks omitted)). The pertinent question is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any

6

individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23; *see also id.* at 325 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."). Omissions and ambiguities "count against inferring scienter." *Id.* at 326.

Those PSLRA pleading requirements apply whether the alleged fraudulent statement at issue is an assertion of current fact or a prediction of the future. *Avaya*, 564 F.3d at 253–54. However, when an allegation involves a prediction, the safe-harbor provision of the PSLRA immunizes from liability any forward-looking statement that "is identified as such and accompanied by meaningful cautionary language; or is immaterial; or [where] the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Id.* at 254; *see also* 15 U.S.C. § 78u-5(c).

## B. Section 10(b) and Rule 10b-5

### 1. Scienter of the Individuals Defendants

To state a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014). As discussed in detail above, the element of scienter must be pled with particularity. *Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009).

Defendants' motion to dismiss the fourth amended complaint focuses on the scienter element. As I must, I discuss the allegations one at a time. I have considered them together, and in the context of the entire complaint. The upshot is this:

The first amended complaint relied on three sets of scienter allegations. First, Plaintiffs asserted that the Board Audit and Risk Committee knew of BT Italy's sustained problems but failed to stop the fraud and concealed the true

7

extent of the problems. (DE 26 ¶ 193). Plaintiffs did not allege facts to support this, and the committee's disclosures do not support that assertion. Plaintiffs also cited a March 2017 media report that in November 2015, BT Italy employees told Jacinto Cavestany, BT Global Services' Vice President of Iberia and Head of Sales in Europe and Latin America, that BT Italy's financial results were being improperly calculated. (DE 26 ¶ 62). Factual substantiation of this belated hearsay account was lacking; Cavestany denied it, and in any event there is no allegation that he made any misleading public statement or reported the conversation to anyone who did. Plaintiffs' third approach was to impute Defendants' scienter from the undisputed fact that BT Italy had engaged in intentional misconduct. (DE ¶¶ 65 & 68). This theory was undercut by Plaintiffs' other allegations that the fraud was conducted in secret.

Now, the fourth amended complaint supplements the scienter allegations from several different angles, largely drawing on media accounts. Plaintiffs again note that BT Group investigated reports of bullying and allege that this demonstrates fraud. Plaintiffs also repeat the opinion of a "source" in a media account that it would have been impossible for the parent company not to know of the fraud at BT Italy. Plaintiffs rely on general statements of the fraud's perpetrators that transactions were approved by BT Group. Next, Plaintiffs claim that a report by Italian prosecutors, which identified pressure to meet high earnings goals, constructively alerted BT Group to the fraud. Finally, Plaintiffs allege, based on public reporting of BT Group's internal review, that the parent company's negligence and mismanagement demonstrate scienter.

Concededly there was fraudulent conduct at the Italian subsidiary. Indeed, the company's public statements and accounting write-downs, following investigation, admitted as much. The allegation here, however, is that management, far from investigating and disclosing the misconduct, knew about and purposely concealed the misconduct in order to defraud investors. There, the allegations are lacking.

### i. "Bullying" and constructive awareness allegations

Plaintiffs' allegations of bullying at BT Italy do not support a strong inference of scienter, because they are not indicative of fraud. In any event, they essentially recast the allegations already dismissed in the first amended complaint.

Bullying in the workplace bespeaks mismanagement, not fraud as such. "[A]n allegation of mismanagement on the part of a defendant will not alone support a claim under § 10(b) or Rule 10b–5." *Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir. 1992); *see also In re Hertz Glob. Holdings, Inc. Sec. Litig.*, No. 13-7050, 2017 WL 1536223 at *16 (D.N.J. Apr. 27, 2017), *aff'd,* 905 F.3d 106 (3d Cir. 2018). The cited bullying allegations are taken from a written statement that BT issued to *Reuters*:

> "Separately, [*i.e.,* separate from the financial irregularities discovered at BT Italy] we received reports of bullying cases at BT Italy at the start of 2016. Senior Human Resources officials visited the Italian offices and investigated. BT does not tolerate bullying or violations of our policies and, as announced previously, a number of senior managers at BT Italy have consequently left the group." [quoting BT Group statement.]
>
> . . .
>
> The investigators, say two sources with knowledge of the case, first obtained the report assigned by BT to KPMG, which allegedly evidenced the accounting irregularities and then the result of the internal audit compiled by the London inspectors, who arrived in Milan last summer for the alleged bullying cases.
>
> . . .
>
> Two different sources with direct knowledge of the case stated that in the 42-page report, many episodes are cited in which [Cimini's] name appears. The report, one of the two sources confirms, concludes with the finding of cases of "bullying and inappropriate behavior" by the Italian management.

(DE 65-1 at 2 & 4). At most, these allegations suggest that BT Group had received reports of bullying in 2016 and that it investigated them. The sense of the *Reuters* item is that BT Group "separately" received reports of bullying—*i.e.,*

9

that the bullying, whatever it consisted of, was distinct from any allegation of financial irregularities. Thus, BT Group's investigation of bullying at its subsidiary does alone not suggest that any individual defendant was aware of fraud.[3]

Indeed, even when tied to allegations of fraud, the launching of an investigation is not sufficient to suggest scienter, and indeed may suggest the opposite. Pertinent to that point is the discussion in my earlier opinion dismissing the first amended complaint:

> "Knowing enough to launch an investigation," the Seventh Circuit has written, "is a very great distance from convincing proof of intent to deceive." *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 758 (7th Cir. 2007). "[F]raud cannot be inferred simply because [the parent corporation] might have been more curious or concerned about the activity at [its subsidiary]." *In re Stonepath Grp., Inc. Sec. Litig.*, No. 4-cv-4515, 2006 WL 890767, at *12 (E.D. Pa. Apr. 3, 2006), *aff'd sub. nom. Globis Capital Partners, L.P. v. Stonepath Grp., Inc.*, 241 F. App. 832 (3d Cir. 2007); *see Chill v. Sen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996) (same); *see also In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 554 (6th Cir. 1999) (holding that courts "should not presume recklessness or intentional misconduct from a parent corporation's reliance on its subsidiary's internal controls"). The issue, after all, is not negligence, but scienter.

(DE 40 at 12–13).

Plaintiffs rely on the same *Reuters* article to argue that Defendants were constructively aware of the ongoing fraud at BT Italy:

> Another internal source adds that he considers it "impossible" that London had no way of realizing what was happening in Italy, noting that the accounting software system at BT Italia is "open" to the parent company and it is possible to conduct checks by logging into the system at any time.
>
> . . .

---

[3]   Plaintiffs' current bullying allegations are also not novel, having been addressed in this Court's earlier opinion. (DE 40 at 5).

> The latter source lastly claims that it would have been practically impossible for an auditor not to realize that something was amiss,

(DE 65-1 at 1–2). Plaintiffs insist that these reports establish Defendants' scienter because the claims "rely on allegations from reputable reporting" and "clearly identify the media sources upon which they rely." (DE 70 at 35–36). It is true of course that *Reuters* is a reputable newsgathering organization. Plaintiffs' allegations, however, fail to establish the "who, what, when, where, and how" that the PSLRA requires. Indeed, Plaintiffs do not at all allege that Defendants ever accessed or reviewed the *Reuters* article or the information cited in it. As with the bullying allegations, these speculative claims establish, at most, negligence—not scienter.

      **ii.**    **"Verified and authorized by BT Group" allegations**

Plaintiffs allege that BT Group knew of the fraud because Gianluca Cimini, BT Italy's former CEO, told *Reuters* that "the financial transactions . . . were properly verified and authorized by the parent company and by the audit units and firms." Plaintiffs also note that Luca Sebastini, BT Italy's former CFO, told Italian prosecutors that "[a]ll the main economic and financial transactions carried out by BT [Italy] were shared with the heads of the European Region [and] with Luis Alvarez (Global Service CEO) and Richard Cameron (Global Service CFO)." However, these allegations do not establish scienter.

To begin with, the statements are not particularly reliable. Cimini and Sebastini were on bad terms with BT Group, having been suspended from their roles at the subsidiary, and had every incentive to shift blame. Moreover, the statements are quite general—they refer, for example, to the "main economic and financial transactions" being "shared"— and they are not accompanied by the particularized allegations that the PSLRA requires. Cimini's statements do not specify what transactions were verified, or who authorized them, or how, or when; moreover, the statements seem to signify at most that auditing controls were in place, not that they had uncovered any misconduct. Likewise, Sebastini's statements do not identify the economic and financial transactions

11

to which he referred, let alone the who, what, when, where, and how. Because of these shortcomings, the allegations are insufficient to demonstrate Defendants' scienter regarding fraudulent transactions.

### iii. The Italian prosecutors' report and the KPMG report

Plaintiffs also claim that separate reports by Italian prosecutors and KPMG both establish Defendants' scienter. However, these reports, described by *Reuters* and *The Telegraph*, do not bolster Plaintiffs' earlier attempts to establish Defendants' scienter.

This Court has already considered the Italian government's investigation of BT Italy:

> The existence of an investigation by the Italian government does not support a strong inference of scienter on the part of BT Group.
>
>> [C]ourts have considered a governmental investigation as one piece of the puzzle when taking a 'holistic' view of the purported facts as they relate to scienter…. [W]hile the existence of an investigation alone is not sufficient to give rise to a requisite cogent and compelling inference of scienter, it may be considered by the Court as part of its analysis.
>
> *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013). I consider the Italian investigation, but in context with the other facts it does not support a strong inference of scienter.

(DE 40 at 16). The articles now cited by Plaintiffs do not rise above the speculative level of the allegations that were already dismissed:

> In the document, prosecutors name Luis Alvarez and Richard Cameron, respectively former chief executive and former chief financial officer of BT Global Services - one of the biggest divisions of BT Group - and Corrado Sciolla, formerly BT's head of continental Europe, among an expanded list of 23 suspects. Alvarez and Cameron were based in London, while Sciolla was in Milan.
>
> The three are accused of setting unrealistically high business targets and of complicity in false accounting at BT Italy, which formed part of the Global Services division, according to the document.

12

(DE 65-2 at 1). Plaintiffs also rely on allegations connected to BT Group's internal review of the Italian fraud scandal. That internal review was produced for the company by KPMG in January 2017 but was never published:

> The report said staff at BT Italia sought to artificially inflate the subsidiary's earnings with a complex web of fraudulent transactions. Italian staff made 'misrepresentations' to BT Group and its auditors at the time, PwC, it added.
>
> But it also revealed executives at BT global services did not sufficiently challenge numbers submitted by Italian staff. Initial inquiries from London were ignored or met by responses that were 'not satisfactory' or lacking in detail, it said, but global services staff often failed to 'follow through' to get answers.

(DE 65-6 at 2). The allegations that rely on these articles lack sufficient detail to plead scienter, because they do not drive these conclusory statements to the standard of likelihood that the PSLRA requires.

Specifically, the allegations concerning Italian prosecutors do not connect Defendants' pursuit of these targets with evidence of fraud. While some individual defendants are accused "of complicity in false accounting at BT Italy," neither the article nor the fourth amended complaint provides any factual substantiation for the scienter theory. Simply stating that persons are on a list of "suspects" being investigated is insufficient. Likewise, Plaintiffs' reliance on the KPMG report gets them nowhere, because the fourth amended complaint's description of the article describing the report does not establish a factual basis for the fraud. Again, at best it is consistent with negligence.

### iv. Chanmugam and Alvarez

Plaintiffs also claim that Defendants' conduct with respect to individual defendants Chanmugam and Alvarez are indicative of scienter. Plaintiffs note that in May 2018 BT Group clawed back Chanmugam's pay, attributing that action, without foundation, to the fraud that had occurred at BT Italy. Plaintiffs also allege that Alvarez's sale of £675,000 worth of BT Group stock in December 2016 demonstrates his scienter. Neither of these allegations is sufficient.

13

> This Court has already addressed the issue of Chanmugam's clawback:
>
> > BT Group's reduction of the pay of executives to reflect actual performance does not give rise to a compelling inference of scienter. No facts are pled to suggest that the reduction in pay was due to their participation in any fraud. *Cf. City of Roseville* [*Emps. Ret. Sys. v. Horizon Lines, LLC*], 713 F. Supp. 2d [378,] 398 [(D. Del. 2010)]. The complaint alleges that the Remuneration Committee recalculated the bonuses to reflect the actual financial results of BT Italy's business.

(DE 40 at 16). When Plaintiffs raised these allegations before, BT Group replied that the clawback did not indicate that Chanmugam was "personally implicated in or culpable for either issue." Plaintiffs have not provided any new allegations tending to demonstrate that the clawback constituted punishment for fraudulent acts, as opposed to poor financial performance. The evidence, as described in the complaint, assumes the fact it is offered to prove.

With respect to Alvarez, Plaintiffs claim that his stock sale is "probative of his consciousness of wrongdoing." Plaintiffs theorize that Alvarez sold shares because he anticipated that BT Group's initial disclosure of fraud at its subsidiary would be followed by an even greater write-down. No facts, however, support the claim that Alvarez knew at the time of the sale that the fraud at BT Italy was larger than initially reported. Accordingly, Plaintiffs' allegations concerning Chanmugam and Alvarez are insufficient to support a strong inference of scienter.

### 2. Corporate Scienter

Plaintiffs attempt to invoke the "corporate scienter" doctrine to impute scienter to BT Group. Other courts have permitted plaintiffs to plead "corporate scienter" without successfully pleading scienter against any individual defendant. *See, e.g., City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 656–59 (6th Cir. 2005). Such decisions require a strong inference that someone in the corporation—who is not, but could have been, an individual defendant—must have acted with scienter in making materially false

14

or misleading statements. *See id.*; *see also Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008).

The Third Circuit has "neither . . . accepted nor rejected the doctrine of corporate scienter in securities fraud actions." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246 (3d Cir. 2013); *see also City of Roseville Emps. Ret. Sys. v. Horizon Lines, LLC*, 442 F. App'x 672, 676–77 (3d Cir. 2011) (declining to decide "if . . it were possible to plead scienter against a corporation without pleading scienter against an individual"). In *City of Roseville*, however, the Third Circuit suggested that plaintiffs might invoke the corporate-scienter doctrine in unique and extraordinary circumstances. 442 F. App'x at 676–76. *Roseville* pointed to *Bridgestone Corp.*, where a tire manufacturer and its subsidiary Firestone had information that their tires were rupturing and causing problems, including a significant number of rollover accidents. *City of Roseville*, 442 F. App'x at 676–76 (citing *Bridgestone Corp.*, 399 F.3d at 656–59). Bridgestone and Firestone allegedly engaged in a variety of tactics, including a large-scale secret settlement with State Farm Insurance Co., to keep news of the scope of the problem from reaching safety regulators and investors. *Bridgestone Corp.*, 399 F.3d at 690–91. After the truth was revealed, plaintiffs filed a securities-fraud action. The Sixth Circuit affirmed dismissal of the claims against the individual defendants but held that the facts supported corporate scienter. *Id.*

In *Roseville,* the Third Circuit cited a hypothetical posited by the Seventh Circuit to explain when an inference of corporate scienter might be appropriate:

> Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false.

*City of Roseville*, 442 F. App'x at 676–77 (citing *Tellabs*, 513 F.3d at 710).

In the *Tellabs* case, the corporate defendant announced that its principal product, accounting for more than half its sales, was being replaced by a

15

successor product. 513 F.3d at 706. The corporate defendant asserted that the successor product was "available now," that "customers [we]re embracing" it, and that Sprint had signed a multiyear $100 million contract to buy it. *Id.* The product was not actually sold at all during the class period. *Id.* The Seventh Circuit inferred corporate scienter because it was highly implausible that key executives in the corporation would not have known whether its principal product was currently being sold. *Id.*[4]

Plaintiffs now rely on the statements of several individual defendants—specifically, Cavestany, Alvarez, and Cameron—to plead the scienter of BT Group as a whole. However, the Third Circuit has not explicitly adopted this doctrine and has cautioned that only extraordinary circumstances would trigger its application. In the opinion dismissing the first amended complaint, this Court considered the hypothetical application to this case of the corporate scienter doctrine:

> "[T]aken collectively," as called for by *Tellabs*, 551 U.S. at 323, the facts and allegations presented by plaintiffs are not so fundamental and pervasive as to support an inference of corporate scienter, as in the *Bridgestone* case (rupturing tires, followed by a coverup) or the General Motors hypothetical (nonexistent SUV sales). There, it was inconceivable that the corporation lacked scienter, even if a particular individual with scienter was not identified and sued. Here, the control issues at BT Italy did not implicate such fundamental corporate matters. Here, based on the allegations, it is at least as likely that key individuals at BT Group were unaware of the fraud, were not reckless in ignoring it, and reacted appropriately when the relevant facts came out. Even if the corporate-scienter doctrine was permitted in this Circuit, these acts would not satisfy that doctrine.

---

[4]   The Second Circuit has placed more emphasis on the identification of an individual whose scienter can be imputed to the corporation—*i.e.,* when "the pleaded facts . . . create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

16

The fourth amended complaint does not contain any allegations that move the needle towards the extraordinary circumstances required to show corporate scienter. Instead, Plaintiffs have concentrated their efforts on allegations against individuals that fall flat nonetheless, *see* Section II.B.1, *supra*. Plaintiffs' Section 10(b) and Rule 10b-5 claims are thus dismissed for failure to adequately plead corporate scienter.

### C. Section 20(a) Allegations

Since Plaintiffs fail to adequately state Section 10(b) and Rule 10b-5 claims, the Section 20(a) claims against the individual defendants fail as well. Liability under Section 20(a) is predicated upon an independent violation of "this chapter or the rules or regulations thereunder." 15 U.S.C. § 78t-1(a); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 207 (1st Cir. 1999). Claims under Section 20(a) therefore, are "derivative—requiring proof of a separate underlying violation of the Exchange Act." *In re Milestone Scientific Sec. Litig.*, 103 F. Supp. 2d 425, 474 (D.N.J. 2000). Because the plaintiffs have not pled a predicate violation of Section 10(b) or Rule 10b-5, the Section 20(a) claim is dismissed.

### III.  CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss the fourth amended complaint (DE 68) is **GRANTED**.

A separate order will issue.

Dated: April 24, 2020

/s/ Kevin McNulty

**Hon. Kevin McNulty**
**United States District Judge**